**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| KASPAROV, PTE LTD., | Case No. 5:22-cv-00503 |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| JOSEPH ZACHERL, | |
| Defendant. | |

NOW COMES Defendant Joseph Zacherl ("Zacherl"), pursuant to Fed. R. Civ. P. 12(b)(6), and hereby submits this Memorandum in Support of his Motion to Dismiss Plaintiff Kasparov, PTE LTD.'s ("Kasparov") Complaint (the "Motion").[1]

## SUMMARY OF NATURE OF CASE

Kasparov alleges that its co-owners and co-founders, Talo and Amber, incorporated Kasparov in Singapore for the purposes of administering a digital finance project referred to as the Rook Project. As part of the Rook Project, Kasparov formed digital wallets (an online service used to store digital assets such as cryptocurrency) – two of which are relevant to its claims (known and referred to as the Second Company Wallet and the Team Tokens Wallet, and together, the "Wallets"). The Wallets were designed to store digitized information concerning the ownership and capital structure of the Rook Project, and tokenized digital assets and other cryptocurrencies. Kasparov alleges that the Wallets required multiple signatures from appointed or authorized

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings provided in the Complaint.

1

individuals as a prerequisite to any transaction involving the digital assets in the Wallets.  The initial signatories on the two Wallets at issue were the two principals of Talo and Amber.

At some point, Kasparov began collaborating with Zacherl on the Rook Project, and agreed to pay him compensation in exchange for his services in connection with the Project pursuant to a Services Agreement entered in or around April 2020.  In October 2021, Kasparov made Zacherl a signatory on the Second Company Wallet and the Team Tokens Wallet.   A few months later, Kasparov agreed to add non-party Jason Linehan as a signatory on both Wallets.  Kasparov also later agreed to add non-party Kyle Detz as a signatory on the Team Tokens Wallet.

The crux of Kasparov's claim against Zacherl is that somehow he (and Linehan and Detz) allegedly "abused the trust that Kasparov had placed in them."   Kasparov's alleged harm supposedly stems from the alleged facts that Zacherl (1) added certain signatories to the Wallets, (2) removed some (but not all) of Kasparov's originally-appointed signatories, and (3) increased the minimum number of signatory approvals required to effectuate transactions with respect to one of the two Wallets.  However, the Complaint is devoid of any allegations that any of the assets were transferred out of or withdrawn from the Wallets, or in any way misused, diverted, or diminished.  Kasparov's allegations that Zacherl made changes to the signatories on the Wallets do not amount to a claim for conversion, or any other cause of action Kasparov has asserted.  Thus, Kasparov fails to state a claim upon which relief can be granted and its Complaint should be dismissed in its entirety.

*First*, Kasparov's conversion claim misunderstands the tort of conversion, which is intended to provide a civil cause of action for theft (or the unlawful exercise of dominion over) goods and personal property.  Kasparov does not allege that Zacherl or anyone else diverted its assets from the Wallets or that there was any change to the amount of assets in the Wallets, but

2

rather that Zacherl's conduct deprived Kasparov of access to or control over the Wallets. Undeniably, Kasparov's "access to" or "control" over the Wallets is an intangible interest and thus cannot provide the basis for a conversion claim under well-established North Carolina law. Moreover, cryptocurrency and other digital assets have been classified by courts as intangible property, and thus could not form the basis for a conversion claim under North Carolina law. Indeed, courts have required conversion of money claims to allege a transfer of a specific amount of money from the plaintiff's possession to the defendant's possession, and that the defendant refused plaintiff's demand to return the money, which Kasparov has not alleged.

*Second*, Kasparov fails to plead the elements of unjust enrichment. Under North Carolina law, to state a claim for unjust enrichment, Kasparov must allege that a benefit was conferred under circumstances giving rise to a legal or equitable obligation on the part of Zacherl to repay or compensate Kasparov for that benefit. Kasparov utterly fails to make any such allegations. And apart from a conclusory allegation that the benefit conferred is "measurable," Kasparov fails to adequately allege a measurable benefit as required under North Carolina law.

*Third*, Kasparov's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") likewise fails to allege critical elements. Because the primary purpose of the UDTPA is to give consumers a private cause of action in the event they fall victim to unfair and deceptive business practices, North Carolina courts have interpreted the statute to reach business disputes in only two situations: (1) interactions between distinct businesses, and (2) interactions between businesses and consumers. Courts have expressly held that the statute does not reach disputes within a business, such as a dispute between an employer and employee, or other intra-business disputes, and that a claim under the UDTPA must *specifically* allege an effect on commerce, and cannot simply rely on conclusory or vague allegations. On its face, Kasparov's

3

attempt to assert a claim under the UDTPA against Zacherl – whom Kasparov agreed to provide signatory authority and to compensate for his services on behalf of Kasparov's business, the Rook Project – should be rejected. Kasparov's one-sentence attempt to allege an effect on commerce is vastly insufficient under North Carolina precedent. Indeed, there is no allegation that Zacherl's conduct had any impact on any person or entity other than Kasparov. The UDTPA claim also fails for lack of a sufficient nexus to North Carolina commerce, as the only alleged injury was suffered by Kasparov in Singapore and there are no allegations that Zacherl's conduct had any impact on North Carolina commerce or consumers. Finally, Kasparov does not adequately allege unfair or deceptive trade practices.

*Fourth,* Kasparov's remaining causes of action for civil conspiracy and declaratory relief fail for the simple reason that the other substantive causes of action fail.

For these reasons, and those set forth in further detail below, Zacherl's Motion to Dismiss should be granted and the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### A. KASPAROV ESTABLISHES THE ROOK PROJECT AND CRYPTOCURRENCY WALLETS.

Kasparov alleges that Talo and Amber founded the Rook Project in late 2019, and subsequently incorporated Kasparov in Singapore on July 6, 2020, for purposes of administering the Project. Compl. ¶ 22, 25. Kasparov alleges it has at all times been owned by Talo and Amber on a 50/50 basis. *Id.* ¶ 25. As detailed in the Complaint, Kasparov established and funded several cryptocurrency wallets to support the Project and its goals. *Id.* ¶¶ 26-27. Kasparov's allegations against Zacherl in the Complaint focus on two wallets: the Team Tokens Wallet (containing 452,137.53 ROOK Tokens and 1,186.94 tokens of Uniswap v2 LP (another type of

4

cryptocurrency), and the Second Company Wallet (containing 714,144.852 in USDC, a cryptocurrency pegged to the U.S. dollar). *Id.*

Both Wallets are "multi-signature wallets that required several individual approvals (sometimes referred to as 'signatures') from appointed/authorized individuals before any transaction to or from the Wallets could be consummated." *Id.* ¶ 8. Initially, Kasparov designated the two principals of Talo and Amber (i.e. its owners) as the two signatories on both Wallets. *Id.*

Kasparov also set up a Distributed Autonomous Organization ("DAO") – an entity structure in which token-holders have the opportunity to participate in the management and decision-making of an entity – to run the Project, with "[a]ll decisions by the DAO . . . voted on by ROOK token holders," and tokens distributed to "stakers" in proportion to the amount of assets they "stake" in the Project. *Id.* ¶ 3.

## B. KASPAROV COLLABORATES WITH ZACHERL, LINEHAN AND DETZ ON THE WALLETS.

Kasparov alleges that after founding the Project in late 2019, it "decided that it would make sense to collaborate with Defendants Zacherl, Linehan and Detz, who would work on various aspects of the Rook Project, including software development and marketing," and "lead certain trading elements in the Project, including the creation and operation of the Keepers that would consummate cryptocurrency arbitrage trades." *Id.* ¶¶ 4, 28. Pursuant to a Services Agreement entered into by Kasparov and Zacherl in or around April 2020, Kasparov agreed that Zacherl would receive 4% of the initial supply of tokens issued by the Project (ultimately amounting to 40,000 ROOK Tokens from an initial issuance of 1,000,000 ROOK Tokens). *Id.* ¶ 5. Kasparov later agreed to pay Zacherl a salary of $10,000 per month as additional compensation for his services. *Id.* ¶ 29. The complaint alleges that Kasparov and Zacherl agreed that Amber and Talo would

receive 80.5% of the initial tokens (i.e. 80.5% of initial 1,000,000 ROOK Tokens). *Id.* ¶ 28. Kasparov does not allege that Amber and Talo's 80.5% share of the initial tokens ever changed or that they no longer are entitled to that share.

Kasparov alleges that it agreed in June 2021, at Zacherl's recommendation, to engage Linehan to work on the Project, initially as an unpaid ambassador for the Project, and then later as an employee of the KeeperDAO with a $3,750 per month salary payable in USD Coin from the DAO Treasury Wallet. *Id.* ¶ 30. Likewise, Kasparov alleges that in July 2021, also at Zacherl's recommendation, it hired Detz to work on the Project as its External Affairs Lead, with a salary paid from the DAO Treasury Wallet. *Id.* ¶ 31.

Kasparov subsequently took several additional actions with respect to Zacherl, Linehan and Detz's roles in connection with the Project. ***First***, on October 14, 2021, and February 24, 2022, respectively, Kasparov added Zacherl and Linehan as signatories to the Second Company Wallet. *Id.* ¶ 34-35. As of February 24, 2022, Kasparov alleges "there were six signatories to the Second Company Wallet: (1) Tiantian Kullander, (2) Taiyang Zhang, (3) Bainy Zhang, (4) Susruth Nadimpalli, (5) Zacherl, and (6) Linehan." *Id.* ¶ 36. ***Second***, on October 14, 2021 and January 2, 2022, respectively, Kasparov added Zacherl and Linehan as signatories to the Team Tokens Wallet. As of January 2, 2022, Kasparov alleges "there were seven signatories to the Team Tokens Wallet: (1) Taiyang Zhang, (2) Tiantian Kullander, (3) Bainy Zhang, (4) Benjamin Wang, (5) Susruth Nadimpalli, (6) Zacherl, and (7) Linehan." ***Third***, Kasparov alleges that it "authorized Zacherl and Linehan to manage 177,777.53 of the over 450,000 ROOK tokens in the Team Tokens Wallet at their own discretion, provided that such discretion was exercised in good faith and in the interests of the Project." Kasparov alleges the remaining ROOK tokens in the Team Tokens Wallet belonged to Kasparov, and Zacherl and Linehan were not authorized to manage those tokens. *Id.*

6

¶ 43. **Fourth**, Kasparov alleges that it added Detz as a signatory on the Team Tokens Wallet at the request of Zacherl on April 21, 2022. *Id.* ¶ 44.

## C. KASPAROV ALLEGES THAT ZACHERL MADE CHANGES TO THE WALLETS.

Kasparov's claims against Zacherl arise from allegations that Zacherl took certain actions that increased his (and Linehan and Detz's) – and diluted Kasparov's – degree of control over the Wallets. However, there are no allegations in the Complaint that Zacherl, or anyone else, ever diverted any of the digital assets from the Wallets, or that there was any change whatsoever to the assets contained in the Wallets as a result of any action taken by Zacherl. Simply put, there is no allegation that any of Kasparov's assets were stolen or diminished.

Kasparov alleges two categories of actions that it contends were unlawful.

### 1. The Addition and Removal of Wallet Signatories.

Kasparov alleges that Zacherl, Linehan and Detz removed signatories aligned with Kasparov, and added signatories who were their "agents." Specifically, Kasparov alleges that on or around June 9, 2022, "using their authority as signatories, Zacherl, Linehan and Detz conspired to create and execute a plan through which (1) Benjamin Wang, (2) Susruth Nadimpalli, and (3) Bainy Zhang, each of whom were representatives and/or associates of Kasparov, were removed as signatories on the Team Tokens Wallet," and to at the same time "have Tommy van Rheeden, who acted as their agent and who is not affiliated with Kasparov, added as a signatory to the Team Tokens Wallet." *Id.* ¶¶ 45-46. As a result of these changes – and the death of a Kasparov-aligned signatory, Tiantian Kullander – Kasparov alleges that only one of the original Kasparov signatories (Taiyang Zhang) remained a signatory as of the date of the Complaint. *Id.* ¶ 48. "[B]ecause three

7

signatories are needed to conduct any transactions using the Team Tokens Wallet," and only one Kasparov signatory remains after Kullander's passing, Kasparov alleges that Zacherl, Linehan, Detz "and their agent, van Rheeden . . . have a sufficient numerical bloc to control the Wallet, to the exclusion of Kasparov." *Id.*

Kasparov asserts similar allegations with respect to the Second Company Wallet. Kasparov alleges that on or around July 7, 2022, "Zacherl and Linehan . . . removed (1) Bainy Zhang and (2) Susruth Nadimpalli as signatories on the Second Company Wallet, leaving only Tiantian Kullander and Taiyang Zhang as the only remaining Kasparov-affiliated signatories on the Second Company Wallet," and on the same day, "added Detz and van Rheeden as additional signatories to the Second Company Wallet." *Id.* ¶ 51. Kasparov alleges "[t]his gave Zacherl, Linehan and their agents four confirmatory signatures, while only two Kasparov-affiliated signatories remained." *Id.*

Kasparov alleges that it did not approve these changes to the Wallet signatories, and that as a result of these changes, "Kasparov no longer has access to its funds" in the Wallets. *Id.* ¶ 50, 53-54. Kasparov further alleges that Zacherl and/or Linehan falsely represented to Kasparov that if they were added as signatories, that "would enable them to execute transaction[s] on Kasparov's behalf" (*id.* ¶¶ 9, 33, 39), and that "Zacherl, Linehan and Detz . . . abused the trust that Kasparov had placed in them" by "prohibit[ing] Kasparov from accessing both Wallets." *Id.* ¶ 11.

**2.  Change to the Signatory Confirmation Security Protocol for the Second Company Wallet.**

Kasparov alleges that on or around July 7, 2022, "Zacherl and Linehan, knowing that only two of the original Kasparov-affiliated signatories remained, changed the signatory confirmation security protocol applicable to the Second Company Wallet to now require a minimum of three

8

confirmatory approvals from registered signatories. In so doing, Zacherl and Linehan sought to prohibit the two remaining Kasparov-affiliated signatories from gaining access to or controlling the Second Company Wallet." *Id.* 52. As a result, Kasparov alleges that "Zacherl, Linehan and their agents, with a total of four signatories, ensured that they would be able to maintain control of Kasparov's Second Company Wallet, wrongly excluding Kasparov." *Id.* ¶ 52. Kasparov alleges it did not approve these changes to the Second Company Wallet (*id.* ¶ 53).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level and have enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, a court need not accept conclusory allegations regarding the legal effect of the facts alleged or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citation omitted). Nor need the court accept "allegations that contradict matters properly subject to judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

## ARGUMENT

Kasparov attempts to bring claims for conversion, unjust enrichment, unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 *et seq*, civil conspiracy, and declaratory

9

relief. Each of these causes of action are based on the same alleged misconduct—namely, the changes to the Wallet signatories described in Section C, *supra*. Kasparov's allegations fail to state a claim.

## A. KASPAROV'S CONVERSION CLAIM FAILS.

"To state a claim [for] conversion under North Carolina law,[2] [a] plaintiff must allege the 'unauthorized assumption and exercise of the right of ownership over **goods or personal chattels** belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Kehrer v. Fields*, No. 5:11-CV-260-FL, 2011 WL 6965714, at *11 (E.D.N.C. Nov. 21, 2011) (quoting *Spinks v. Taylor,* 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981)) (emphasis added). "Conversion is limited to claims involving goods and personal property and does not include interests such as business opportunities and expectancy interests." *Id.* (internal quotations omitted)*; see also Edmondson v. American Motorcycle Ass'n., Inc.,* 7 Fed. Appx. 136, 148 (4th Cir.2001) ("intangible business assets such as business expectancies and good will may not be the proper subject of a claim for conversion under North Carolina's common law"). North Carolina courts have defined "intangible assets" broadly: "An 'intangible asset' is 'an asset that is not a

---

[2] "Under the lex loci test, tort claims are governed by the law of the place of injury, which is sustained in the jurisdiction where the last act giving rise to the injury occurred." *Cardiorentis AG v. IQVIA Ltd.*, 373 N.C. 581, 321, 837 S.E.2d 873, 880 (2020). Kasparov does not specifically allege that any of the acts giving rise to its claims occurred in North Carolina, apart from the general allegation that Zacherl resides in North Carolina. However, Zacherl accepts for purposes of this motion that North Carolina law applies to Kasparov's claims. In the event Kasparov contests the application of North Carolina law to one or more of its causes of action, Zacherl reserves the right to seek a stay or dismissal based on *forum non conveniens*. *See id.* at 320 ("State and federal courts alike agree that the need to apply foreign law favors a stay in a *forum non conveniens* analysis"). *See also RF Micro Devices, Inc. v. Xiang*, No. 1:12CV967, 2013 WL 5462295, at *5 (M.D.N.C. Sept. 30, 2013) ("The Supreme Court has noted that '[m]any *forum non conveniens* decisions have held that the need to apply foreign law favors dismissal.'") (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n.29 (1981)).

WBD (US) 60255197v1

physical object[.]'" *Flexible Foam Prods., Inc. v. Vitafoam Inc.*, 980 F. Supp. 2d 690, 700 (W.D.N.C. 2013) (quoting *Edmondson,* 7 Fed.Appx. at 148).

Accordingly, courts have routinely dismissed conversion claims based only on intangible interests or rights, and not "goods and personal property." For example, in *Surratt v. Brown*, the court found plaintiff's conversion claim based on "his right to partnership property, his membership interest in the LLC/Partnership, and his right to participate in management of the LLC/Partnership" was based on "intangible" interests and thus could not form the basis for a conversion claim. No. 15 CVS 1551, 2015 WL 4523291, at *7 (N.C. Super. July 27, 2015). Likewise, in *Kamel v. 5Church, Inc.*, the court found that a claim for conversion of "administrative rights to the email domains" was based on "intangible interests that may not be the subject of a conversion claim." No. 3:17-cv-507-RJC-DCK, 2019 WL 4024252, at *17 (W.D.N.C. Aug. 23, 2019). In numerous other contexts, courts have dismissed conversion claims based on intangible interests.[3]

_____

[3] *See Superior Performers, Inc. v. Fam. First Life, LLC*, No. 1:14CV283, 2014 WL 7338923, at *9 (M.D.N.C. Dec. 22, 2014) ("Plaintiff at no time alleged in its Complaint that the object of its conversion claim is the Mark itself, but instead Plaintiff appears to only state that NAA misappropriated the intangible object of commercial and competitive advantage"); *Flexible Foam Prods., Inc.*, 980 F. Supp. at 700 ("a chose in action . . . is an intangible asset" that "could not be subject to conversion"); *Duffy v. Camp*, 2022-NCCOA-836, 2022 WL 17814508, at *13 (N.C. App. Dec. 20, 2022) ("To the extent that the property that Duffy alleges was misappropriated includes business opportunities, expectancy interests, and contract rights, summary judgment was appropriate"); *Precision Components, Inc. v. C.W. Bearing USA, Inc.*, 630 F. Supp. 2d 635, 642 (W.D.N.C. 2008) ("the 'thing' the Plaintiff claims was stolen," namely, "valuable customer files," "was not a tangible asset, and thus was not subject to being converted"); *Global Textile All., Inc. v. TDI Worldwide, LLC*, No. 17 CVS 7304, 2018 WL 6272929, at *11 (N.C. Super. Nov. 29, 2018) ("to the extent the Dolven Defendants seek dismissal of Plaintiff's claim[] for . . . business conversion based on the Dolven Defendants' alleged diversion of Plaintiff's trade secrets, it should be GRANTED").

WBD (US) 60255197v1

Kasparov's conversion claim fails because it is not based on an allegation that any of the digital assets (*i.e.* the ROOK tokens and other cryptocurrencies) contained in the Wallets were taken, diverted, diminished or misused. Instead, it is based exclusively on alleged changes to the Wallet signatories described in Section C, *supra*, which Kasparov alleges "deprived Kasparov from control over its Wallets." *See* Compl. ¶¶ 59-65. Kasparov's allegations of interference with its rights with respect to, or degree of control over, the Wallets involve the kinds of intangible interests that North Carolina courts have recognized cannot support a conversion claim.

Even if Kasparov had alleged some facts suggesting interference with the digital assets in the Wallets – which it has not, for the reasons stated above – its claim would still fail. The assets contained in the Wallets are ROOK Tokens and cryptocurrencies, and courts have recognized digital assets as intangible property. *See Ox Labs Inc. v. BitPay, Inc.*, 848 F. App'x 795, 796 (9th Cir. 2021) ("The California Supreme Court has yet to decide whether Bitcoins can be specifically recovered in a conversion action. Based on our review of California authorities, however, we conclude that they cannot. Specific recovery is unavailable when the converted property is intangible."); *Jeong v. Nexo Fin. LLC*, No. 21-CV-02392-BLF, 2022 WL 174236, at *24 (N.D. Cal. Jan. 19, 2022) (referring to "cryptocurrencies" as "intangible goods"); *Currier v. PDL Recovery Grp.*, LLC, No. 14-12179, 2018 WL 4057394, at *2 (E.D. Mich. Aug. 27, 2018) (finding defendant's "cryptocurrency accounts with Coinbase" to be "intangible personal property"); *Alexander v. BF Labs Inc.*, No. 14-2159-KHV, 2014 WL 5406890, at *1 (D. Kan. Oct. 22, 2014) ("A Bitcoin is a unit of intangible currency that exists only on the internet").

Assuming *arguendo* the digital assets are tangible property, courts have required conversion of money claims to include "allegations or evidence of a transfer of a specific amount of money from a plaintiff to a defendant, with the defendant taking possession of that specific,

12

identifiable amount." *Taylor v. Bettis*, 976 F. Supp. 2d 721, 744 (E.D.N.C. 2013), *aff'd*, 693 F. App'x 190 (4th Cir. 2017). *See also Wake Cnty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 653, 762 S.E.2d 477, 490 (2014) (affirming dismissal of conversion claim over "a category of monies allegedly owed" where the county failed to establish "the funds' specific source, specific amount, and specific destination"). Moreover, where a "Plaintiff seeks to maintain a conversion claim for money" it "must have first made a demand for a return of such money," and must identify "any specific payment it made to Defendant by amount or date, or otherwise sufficiently identif[y] the money alleged to have been converted." *Progress Point One-B Condo. Ass'n, Inc. v. Progress Point One Prop. Owners Ass'n, Inc.*, No. 14 CVS 467, 2015 WL 859833, at *3 (N.C. Super. Mar. 2, 2015). Once again, there are no allegations that Kasparov transferred any digital assets to Zacherl, or that Zacherl transferred Kasparov's digital assets to himself or anyone else for their own use. While Kasparov alleges it demanded that Zacherl "restore Kasparov's control and ability to utilize to the Team Tokens Wallet and the Second Company Wallet by restoring the recently removed Kasparov-affiliated representatives as signatories to both the Team Tokens Wallet and the Second Company Wallet" (Compl. ¶ 63), it does not allege any digital assets were taken from the Wallets, and thus does not allege that it demanded any digital assets be returned to the Wallets.

**B.      KASPAROV'S UNJUST ENRICHMENT CLAIM FAILS.**

"Under North Carolina law, unjust enrichment is an equitable doctrine that allows for the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Augustson v. Bank of Am., N.A.*, 864 F. Supp. 2d 422, 438 (E.D.N.C. 2012) (internal quotations omitted). "[U]nder North Carolina law, a benefit is unjust when the benefit was conferred under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the

benefits received." *Id.* at 438–39 (internal quotations omitted). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, the benefit must be measurable, and the defendant must have consciously accepted the benefit." *Town of Carolina Shores v. Cont'l Ins. Co.*, No. 7:10-CV-13-D, 2010 WL 4338437, at *4 (E.D.N.C. Oct. 26, 2010) (internal quotations omitted).

Kasparov's unjust enrichment claim is defective as plead for two reasons. ***First***, Kasparov utterly fails to allege a critical element of unjust enrichment—that a benefit was conferred "under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." *Town of Carolina Shores*, 2010 WL 4338437, at *4 (internal quotations omitted). Kasparov alleges that "[t]hrough the unapproved changes Zacherl and his co-conspirators implemented to the signatories associated with the Team Tokens Wallet and the Second Company Wallet, a measurable benefit has been conferred on Zacherl: namely, possession and control of the digital assets in the Wallets." Compl. ¶ 67. Kasparov alleges that "it would be inequitable to permit Zacherl" to maintain the alleged benefits (Compl. ¶ 70), but does not allege (i) that Zacherl is obligated to repay or compensate Kasparov as a result of obtaining the alleged benefit, (ii) any circumstances giving rise to such an obligation, or (iii) what amount of compensation is owed. Moreover, Kasparov does not allege that it *conferred* the benefit of control over the Wallets on Zacherl, but rather that Zacherl seized and maintained control over Kasparov's objection. *See id.* ¶ 69. Thus, Kasparov fails to allege it conferred a benefit upon Zacherl under circumstances which give rise to a legal or equitable obligation to account for the benefit received, and thus fails to state a claim for unjust enrichment.

***Second***, the unjust enrichment claim is defective because Kasparov fails to allege a *measurable* benefit. Kasparov alleges that the "possession and control of the digital assets in the

14

Wallets" constitutes a "measurable benefit."  Compl. ¶ 67.  This assertion is entirely conclusory, and the alleged benefit – "possession and control" of assets, but *not* "ownership" of the Wallets or assets, which have at all times been owned by Kasparov (*see id.* ¶¶ 56-57) – is akin to the "nebulous" benefits courts have found insufficient to support a claim for unjust enrichment.  *See Campbell Sales Grp., Inc. v. Niroflex by Jiufeng Furniture*, LLC, No. 19 CVS 865, 2022 WL 17413381, at \*10 (N.C. Super. Dec. 5, 2022) ("Although LIU contends that it conferred upon Genfine the opportunity for new business relationships, such an assertion is too nebulous and does not involve the type of measurable benefit that our courts have previously recognized as sufficient to support an unjust enrichment claim").  Moreover, Kasparov does not allege Zacherl used his "possession and control" over the digital assets to transfer them to himself or to otherwise enrich himself in any way, and thus it is unclear how the alleged "possession and control" constitutes a measurable benefit.

## C.  KASPAROV'S DECEPTIVE TRADE PRACTICES CLAIM FAILS.

Kasparov's claim under N.C. Gen. Stat. § 75-1.1 *et seq.*, North Carolina's Unfair and Deceptive Trade Practices Act, suffers from insurmountable defects.  To state a claim under the UDTPA, one must allege three elements: "(1) the defendant committed an unfair or deceptive act or practice (2) that was in or affecting commerce and (3) proximately caused injury."  *Stack v. Abbott Lab'ys, Inc.*, 979 F.Supp.2d 658, 667 (M.D.N.C. 2013).  A plaintiff asserting claims under the UDTPA "must allege facts that support each element of the claim in terms that are not vague or conclusory."  *Maxwell v. Phillips*, No. 1:06CV00510, 2007 WL 2156337, at \*7 (M.D.N.C. July 25, 2007).  A plaintiff "must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises."  *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991).  Failure to allege facts meeting the "affecting

15

commerce" requirement alone compels dismissal. *See id.*, 328 N.C. at 592-93, 403 S.E.2d at 492-494 (affirming dismissal for failure to meet "affecting commerce" requirement). Kasparov falls far short of alleging sufficient facts to satisfy the "affecting commerce" element, and North Carolina precedent concerning that element demonstrates that Kasparov's attempt to assert a claim under the UDTPA is an attempt to fit a square peg in a round hole.

The "affecting commerce" requirement strictly circumscribes the type of business activity covered by the UDTPA. Courts have repeatedly emphasized that the UDTPA "is not intended to apply to all wrongs in a business setting." *See, e.g., Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 519 (4th Cir. 1999); *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F. Supp. 3d 1011, 1021 (E.D.N.C. 2015), aff'd, 674 F. App'x 250 (4th Cir. 2016); *HAJMM Co.*, 328 N.C. at 593, 403 S.E.2d. at 492. Rather, "the North Carolina Supreme Court explained that the UDTPA was intended to apply to two situations: "(1) interactions *between businesses*, and (2) interactions *between businesses and consumers*." *Stack,* 979 F.Supp.2d at 667 (quoting *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010)) (emphasis added).[4] "Consequently, 'any unfair or deceptive conduct contained solely within a single business is not covered by the Act.'" *Id.* (quoting *White*, 364 N.C. 47 at 53, 691 S.E.2d at 680). "For this reason, North Carolina courts have generally exempted disputes arising from the employer-employee relationship from the UDTPA because they do not affect commerce." *Id. See also White*, 364 N.C. at 53, 691 S.E.2d at 680 (finding that the UDTPA does not extend to a business's "internal operations" or to the

---

[4] The narrow application of the UDTPA is consistent with the "primary purpose" of the statute, which is "to provide a private cause of action for consumers." *Durling v. King*, 146 N.C.App. 483, 488, 554 S.E.2d 1, 4 (2001); *see also Food Lion*, 194 F.3d at 520 ("[T]he fundamental purpose of the UTPA is to protect the consumer, and courts invariably look to that purpose in deciding whether the Act applies.").

16

"internal conduct of individuals within a single market participant, that is, within a single business" and that "the General Assembly intended the Act's provisions to apply to interactions between market participants").[5]

Accordingly, courts routinely dismiss claims under the UDTPA that are intra-business disputes between an employer and employee, or among partners within a single business. *See e.g.*, *Wilson v. Blue Ridge Elec. Mbrshp. Corp.*, 157 N.C. App. 355, 358, 578 S.E.2d 692, 694 (2003) (changing corporate bylaws to affect the composition of the corporation's management was an internal business activity that did not affect commerce); *White*, 364 N.C. at 53-54, 691 S.E.2d at 680 (a dispute among business partners did not affect commerce where, among other things, the defendant partner had improperly diverted work and financial opportunities away from plaintiff partners to a group of men with whom he preferred to work); *Stuart*, 2019 WL 13217414, at *2 (dismissing UDTPA claim because employee failed to allege facts showing employer's acts impacted "other market participants or customers"); *Durling*, 146 N.C.App. at 488-489, 554 S.E.2d at 4-5 (a dispute between a sales representative and his sub-representatives over the allocation of commissions did not affect commerce); *Maxwell*, 2007 WL 2156337, at *7 (dismissing UDTPA claim because dispute over allocation of royalties among former band members did not affect commerce); *Polyquest, Inc. v. Vestar Corp, LLC*, No. 7:13-CV-23-F, 2014 WL 496494, at *11-12 (E.D.N.C. Feb. 6, 2014) (dismissing UDTPA claim regarding internal

---

[5] *See also Stuart v. Churn LLC,* No. 1:19-CV-369, 2019 WL 13217414, at *2 (M.D.N.C. June 6, 2019) (holding that the UDTPA was intended "to apply to interactions between market participants" and thus does not cover conduct "contained solely within a single business.") (internal quotations omitted); *Nobel v. Foxmoor Grp.,* LLC, 380 N.C. 116, 121 868 S.E.2d 30, 34 (2022) ("The internal operations of a business entity are not within the purview of the [UDTPA].").

WBD (US) 60255197v1

operations of a joint venture, because the joint venture was a "single market participant," even if technically comprised of separate entities).

This dispute is between a corporate entity (Kasparov), which was formed to administer the Rook Project, and an individual who is compensated by that entity for his services in relation to the Rook Project pursuant to a Services Agreement (Zacherl). Compl. ¶¶ 28-29. Kasparov also alleges misconduct by Linehan and Detz, who likewise are paid salaries by Kasparov for their services in relation to the Rook Project. *Id.* ¶ 6. This is precisely the kind of intra-business dispute that cannot form the basis for a claim under UDTPA.

Kasparov devotes merely one sentence in attempt to articulate how Zacherl's actions supposedly affect commerce: "Zacherl's actions affected commerce by preventing Kasparov's access to its property, which is used, *inter alia*, in its regular course of business as part of the Rook Project." *Id.* ¶ 79. However, the Complaint does not explain how *Kasparov's* access to the Wallets and assets it alleges it owns affects commerce. Kasparov does not allege that its diminished access to or control over the Wallets affected any person or entity apart from Kasparov itself. The lone sentence Kasparov includes in attempt to satisfy this critical element of the UDTPA is vague and conclusory, and thus vastly insufficient. *See Maxwell*, 2007 WL 2156337, at *7. Because Kasparov has not adequately alleged that Zacherl's conduct affected commerce, it fails to state a claim under the UDTPA.

Kasparov's UDTPA claim should also be dismissed because it fails to allege any impact on North Carolina commerce or consumers. The court's decision in *Verona v. U.S. Bancorp*, No. 7:09–CV–057–BR, 2011 WL 1252935 (E.D.N.C. Mar. 29, 2011) is instructive with respect to the extraterritorial application of the statute. The court began by noting that a prior court held that the statute "requires an in-state injury to plaintiff before plaintiff can state a valid unfair trade

18

claim." *Verona*, 2011 WL 1252935, at \*12 (quoting *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494 (M.D.N.C.1987)).  Noting that successful plaintiffs could receive treble damages and attorneys' fees under the UDTPA, the court in '*In' Porters* found it appropriate to limit the statute's "reach to cases involving a substantial effect on plaintiff's operations in North Carolina." *Id.* (citing *The 'In' Porters, S.A.*, 663 F.Supp. at 502).  The ultimate conclusion of *'In' Porters* was that "[b]ecause the plaintiff admitted that its business operations were solely in France and that it had no operations in North Carolina, the court concluded the claim falls outside the reach of 75–1.1[.]" *Id.* (internal quotations omitted).  The court then highlighted the line of cases following *'In' Porters* and rejecting UDTPA claims by foreign entities where the plaintiff failed to allege an effect on North Carolina commerce:

> A number of cases have followed *'In' Porters'* line of reasoning to dismiss UDTPA claims by foreign entities. *See, e.g., In re Genetically Modified Rice Lit.,* 666 F.Supp.2d 1004, 1017–18 (E.D.Mo.2009) (granting summary judgment in favor of corporations allegedly involved in contamination of U.S. rice supply on Missouri rice producers' UDTPA claims, noting that, although some of defendants' decision-making occurred in North Carolina, "the claims of plaintiffs cannot be said to arise mainly from those North Carolina activities" and "[p]laintiffs have not shown that their claims have a sufficient effect on North Carolina business for them to benefit from this act intended to protect North Carolina commerce"); *Merck & Co. v. Lyon,* 941 F.Supp. 1443, 1462–63 (M.D.N.C.1996) (dismissing UDTPA claim of foreign corporations based on hiring away of foreign corporations' former employee and alleged disclosure and use of trade secrets by North Carolina corporation where the foreign corporations failed to allege a substantial effect on any in-state business operations); *Dixie Yarns, Inc. v. Plantation Knits, Inc.,* No. 3:93CV301–P, 1994 WL 910955, \*2–3 (W.D .N.C. July 12, 1994) (holding foreign corporation did not state claim under UDTPA against corporation with North Carolina manufacturing facility because the product at issue proved defective in a state outside of North Carolina, thus a foreign injury occurred, and foreign corporation could not show it had any North Carolina business operations).

*Id.* at \*13.  While the court in *Verona* recognized the possibility that a claim could be asserted under the UDTPA by a foreign plaintiff against a North Carolina business, it only found that to be true where the unfair and deceptive acts "took place in and emanated from" the business's

headquarters in North Carolina. *Id.* at *15. Thus, a foreign plaintiff must allege some nexus to North Carolina commerce, and the mere fact that one or more defendants resides in North Carolina is not sufficient on its own.[6]

The only injury Kasparov has alleged is to itself, and it has alleged that it is incorporated and has its principal place of business in Singapore. Compl. ¶ 15. The claims against Zacherl relate to his activities in connection with the Rook Project, which is administered by Kasparov. Apart from the allegations that Zacherl performs services related to the Rook Project, and that he resides in North Carolina, there are no allegations of any other nexus between Kasparov's claims and North Carolina. In fact, Kasparov does not allege that any of the actions Zacherl took that form the basis for its claims took place in North Carolina. At most, Kasparov has alleged that Zacherl altered the signatories for the Wallets, which Kasparov alleges it established and has at all times owned, and does not allege are located in North Carolina. Moreover, Kasparov alleges that several of the changes to the signatories giving rise to its claims were taken by "Zacherl, Linehan and Detz" or "Zacherl and Linehan." *See* Compl. ¶¶ 12-14. Kasparov alleges Linehan and Detz reside in New Hampshire and Massachusetts. *See* Compl. ¶¶ 17-18. There are no allegations of any injury felt in North Carolina, or any effect whatsoever on North Carolina commerce. Thus,

---

[6] *See The 'In' Porters*, 663 F. Supp. at 501-02 (dismissing UDTPA claim because it involved "a foreign plaintiff suing a resident defendant over alleged foreign injuries having a negligible effect, if any, on North Carolina trade or commerce."); *Merck & Co. Inc.*, 941 F. Supp. 1443 (dismissing UDTPA claim by foreign plaintiffs against North Carolina defendant because plaintiffs did not experience substantial effects on any North Carolina business operations); *US LEC Commc'ns, Inc. v. Qwest Commc'ns Corp.*, No. 3:05-CV-00011, 2006 WL 1367383, at *3 (W.D.N.C. May 15, 2006) (rejecting UDTPA counterclaim by foreign defendant against North Carolina-based plaintiff because defendant "failed to allege that it suffered substantial in-state injury" to business operations in North Carolina); *Dixie Yarns, Inc.*, 1994 WL 910955 (dismissing UDTPA counterclaim by foreign defendant against plaintiff whose relevant conduct occurred at its North Carolina manufacturing plant because defendant did not experience business injury in North Carolina).

WBD (US) 60255197v1

the extraterritorial application of the UDTPA would be entirely inappropriate and inconsistent with precedent.

Kasparov's UDTPA claim should also be dismissed for failure to adequately allege an unfair or deceptive trade practice. Kasparov's UDTPA claim is based on an alleged representation by Zacherl that "if Kasparov added them as signatories, it would enable them to execute transaction on Kasparov's behalf, which would inure to Zacherl's and Kasparov's benefit." Compl. ¶ 39. Kasparov does not allege that the mere representation that making Zacherl a signatory would give Zacherl the authority to execute transactions on Kasparov's behalf was false. Rather, Kasparov's UDTPA claim is apparently based on the allegation that "Zacherl never intended to execute transactions on Kasparov's behalf." *Id.* There is no allegation in the Complaint that Zacherl ever promised to act as Kasparov's agent or representative in his capacity as a signatory. Kasparov also failed to allege that it actually and reasonably relied on any representation by Zacherl. *See Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 411 (E.D.N.C. 2015) ("When the alleged UDTPA violation is a misrepresentation . . . a plaintiff must plausibly allege actual reliance and reasonable reliance.").

## D. KASPAROV'S CIVIL CONSPIRACY CLAIM FAILS.

"It is well established that there is not a separate civil action for civil conspiracy in North Carolina . . . . Instead, civil conspiracy is premised on the underlying act." *Gottfried v. Covington*, No. 13 CVS 456, 2014 WL 2921922, at *6 (N.C. Super. June 25, 2014). "North Carolina courts have held that a civil conspiracy claim is subject to dismissal when the underlying causes of action, which contain the alleged wrongful acts, are dismissed." *Koch Measurement Devices, Inc. v. Armke*, No. 12 CVS 3478, 2015 WL 2092649, at *10 (N.C. Super. May 1, 2015) (internal quotations omitted). Because Kasparov fails to state a claim for conversion,

21

unjust enrichment or a violation of the UDTPA, the civil conspiracy claim must be dismissed. *See*

*Gottfried*, 2014 WL 2921922, at *7 (finding "Plaintiff's underlying claim for conversion" based

on intangible interests "fails, leaving no premise for the civil conspiracy claim"). *See also Koch*

*Measurement Devices, Inc.*, 2015 WL 2092649, at *10 ("Plaintiff's claim for civil conspiracy is

based entirely on Armke's alleged breach of fiduciary duty," which was dismissed, and thus "[t]he

Court concludes that North Carolina law mandates dismissal of Plaintiff's claim for civil

conspiracy").

## E.     THERE IS NO BASIS FOR DECLARATORY RELIEF.

Finally, Kasparov tacks on a request for declaratory relief that is entirely duplicative of its

other causes of action and should be dismissed. "[F]ederal standards guide the inquiry as to the

propriety of declaratory relief in federal courts, even when the case is under the court's diversity

jurisdiction." *See Sasso v. Tesla, Inc.*, 584 F.Supp.3d 60, 70 (E.D.N.C. 2022); *see also Staffing*

*Advantage LLC v. Definitive Staffing Sols., Inc.*, No. 7:20-CV-00150-M, 2021 WL 2426340, at *9

(E.D.N.C. June 14, 2021) ("[I]n adjudicating claims for declaratory relief, federal courts apply the

federal Declaratory Judgment Act, 28 U.S.C. § 2201, rather than state analogues like N.C. Gen.

Stat. § 1-253.). Declaratory judgments under federal law are "purely remedial and do[] not create

jurisdiction or create substantive rights." *Sasso*, 584 F.Supp.3d. at 71. This means that a "request

for declaratory relief is barred to the same extent that the claim for substantive relief on which it

is based would be barred." *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 55-

56 (4th Cir. 2011).

Courts have thus rejected declaratory judgment claims where the plaintiff's other

substantive claims have failed. *See id.* ("Here, CGM's substantive claims fail. Accordingly, so

must its Declaratory Judgments Act claim."); *Cybernet, LLC v. David*, No. 7:16-CV-16-RJ, 2018

22

WL 577951, at *16 (E.D.N.C. Nov. 2, 2018) (holding on summary judgment that plaintiffs' declaratory judgment claim fails "for the same reasons" plaintiffs' § 1983 claim fails because the declaratory judgment claim is "factually subsumed" in the § 1983 claim), aff'd, 954 F.3d 162 (4th Cir. 2020); *Robinson v. E. Carolina Univ.*, 329 F.Supp.3d 156, 186 (E.D.N.C. 2018) ("Because plaintiff has no underlying federal legal claim against ECU defendants, the court lacks jurisdiction over plaintiff's declaratory judgment claim.").

Likewise, courts have exercised their discretion to dismiss requests for declaratory judgment that are duplicative of the plaintiff's other claims. "A district court, in its discretion, may decline to entertain a declaratory judgment claim for good reason." *Willis v. Cleveland Cnty., N. Carolina*, No. 1:18-cv-00292-MR-WCM, 2020 WL 3578297, at *18 (W.D.N.C. July 1, 2020). "Courts have used that discretion to decline to adjudicate declaratory judgment actions that are duplicative of other claims in the same case. *Id.* (finding "Plaintiff's request for a declaratory judgment appears to be based on the same allegations as the other claims in the Complaint" and was therefore "duplicative of the Plaintiff's other claims," and "[a]s such, the Court will utilize its discretion to decline to consider the Plaintiff's duplicative request for declaratory judgment"). *Id.*

If Kasparov's other causes of action are dismissed, which they should be for the reasons set forth above, then its declaratory judgment claim must be dismissed as well. Moreover, Kasparov's declaratory judgment claim is based on the *exact same* allegations that underpin its other claims. Specifically, Kasparov seeks "a declaration that (1) it has the right to immediately possess the Team Tokens Wallet, the Second Company Wallet and any and all of the digital assets therein, and (2) that Zacherl has no right to possess the Team Tokens Wallet or the Second Company Wallet or any of the digital assets therein." Compl. ¶ 83. Thus, Kasparov's request for declaratory relief requires the adjudication of the same legal question at the core of its other causes

23

of action: whether the alleged changes to the Wallet signatories described in Section C, *supra*, were unlawful. Therefore, the court should exercise its discretion and dismiss Kasparov's request for declaratory judgment for the additional reason that it is duplicative of the other causes of action.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion and enter an order dismissing the Complaint and granting him such other and further relief as the Court deems just and proper.

This the 20th day of January, 2023.

*/s/ B. Chad Ewing*
WOMBLE BOND DICKINSON (US) LLP
B. Chad Ewing (N.C. State Bar No. 27811) 301
South College Street, Suite 3500 Charlotte, North
Carolina 28202-6037 Telephone: (704) 331-4996
Facsimile: (704) 338-7854
E-Mail: chad.ewing@wbd-us.com

HOGAN LOVELLS US LLP
Michael C. Hefter (appearing by Notice of Special Appearance)
Alan M. Mendelsohn (appearing by Notice of Special Appearance)
390 Madison Avenue
New York, New York 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
E-Mail: michael.hefter@hoganlovells.com
        alan.mendelsohn@hoganlovells.com

WBD (US) 60255197v1

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2023, the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** was served via first class mail as follows:

Joseph A. Mahoney
N.C. State Bar No. 55318
Cecilia G. Rambarat
N.C. State Bar No. 58047
MAYER BROWN LLP
300 North Tryon Street, Suite 1800
Charlotte, NC 28202
(704) 444-3654
jamahoney@mayerbrown.com
crambarat@mayerbrown.com

Alex J. Lakatos
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006

Matthew H. Marmolejo
MAYER BROWN LLP
333 South Grand Avenue, Suite 4700
Los Angeles, CA 90071

*Counsel for Plaintiff*

*/s/ B. Chad Ewing*
B. Chad Ewing

WBD (US) 60255197v1