**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| KASPAROV, PTE LTD., | Case No. 5:22-cv-00503 |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF** |
| | **MOTION TO DISMISS** |
| JOSEPH ZACHERL, | **AMENDED COMPLAINT** |
| Defendant. | |

NOW COMES Defendant Joseph Zacherl ("Zacherl"), pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and hereby submits this Memorandum in Support of his Motion to Dismiss Plaintiff Kasparov, PTE LTD.'s ("Kasparov") Amended Complaint (the "Motion").[1]

## SUMMARY OF NATURE OF CASE

Kasparov alleges that its co-founders, Talo and Amber, incorporated Kasparov in Singapore for the purposes of administering a digital finance project referred to as the Rook Project. As part of the Rook Project, Kasparov formed digital wallets (an online service used to store digital assets) – two of which are relevant here (known as the Second Company Wallet and the Team Tokens Wallet, and together, the "Wallets"). The Wallets were designed to store digitized information concerning the ownership and capital structure of the Rook Project, and tokenized digital assets and other cryptocurrencies. Kasparov alleges that the Wallets required multiple signatures from appointed or authorized individuals as a prerequisite to any transaction involving the digital assets in the Wallets. The initial signatories on the two Wallets at issue were the two principals of Talo and Amber.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings provided in the Amended Complaint.

At some point, Kasparov sought the expertise of Zacherl in connection with administering the Rook Project, and agreed to pay him compensation in exchange for his services pursuant to a Services Agreement entered in or around April 2020.  In October 2021, Kasparov made Zacherl a signatory on both the Second Company Wallet and the Team Tokens Wallet.  A few months later, Kasparov agreed to add non-party Jason Linehan as a signatory on both Wallets.  Kasparov also later agreed to add non-party Kyle Detz as a signatory on the Team Tokens Wallet.

The crux of Kasparov's claim against Zacherl is that somehow he (and Linehan and Detz) allegedly "abused the trust that Kasparov had placed in them."  Kasparov's alleged harm supposedly stems from its vague and conclusory claim that it was Zacherl who (1) added certain signatories to the Wallets, (2) removed some (but not all) of Kasparov's originally-appointed signatories, and (3) increased the minimum number of signatory approvals required to effectuate transactions with respect to the Second Company Wallet.  However, the Amended Complaint is devoid of any allegations that assets were transferred out of the Wallets, or in any way misused, diverted, defalcated or diminished.  Kasparov's original complaint failed to state a claim because Zacherl's alleged changes to the signatories on the Wallets simply did not amount to conversion as a matter of law.  The Amended Complaint is no closer to stating a claim.

Recognizing the deficiency of its original pleading, Kasparov attempts to salvage its claims by tacking on additional causes of action based on the same factual allegations.  The attempt fails. In its Amended Complaint, Kasparov alleges it formed an agreement with Zacherl concerning the use of the Wallets, which Zacherl allegedly breached, and that Zacherl fraudulently induced Kasparov into making Detz a signatory to the Team Tokens Wallet.  However, the Amended Complaint is devoid of any allegations concerning the formation of the alleged agreement or its essential terms, or the alleged misrepresentations and other elements of fraud, including scienter,

with the particularity required under Rule 9(b). For the following reasons, the Amended Complaint should be dismissed in its entirety.

*First*, Kasparov misunderstands the tort of conversion, which is intended to provide a civil cause of action for theft (or the unlawful exercise of dominion over) goods and personal property. Kasparov does not allege that Zacherl or anyone else diverted its assets from the Wallets or that any assets in the Wallets were "stolen." The only allegation is that Zacherl deprived Kasparov of access to or control over the Wallets by virtue of the change in the authorized signatories. Undeniably, Kasparov's "access to" or "control" over the Wallets, however, is an intangible interest and thus cannot provide the basis for a conversion claim under well-established North Carolina law. Moreover, cryptocurrency and other digital assets have been classified by courts as intangible property, and thus any allegation that Zacherl interfered with control or access to those assets similarly cannot form the basis for a conversion claim. Indeed, courts have required conversion of money claims to allege a transfer of a specific amount of money from the plaintiff's possession to the defendant's possession, which Kasparov has not and cannot allege.

*Second,* Kasparov's breach of contract claim fails because it fails to allege the most basic details concerning the formation of the alleged agreement or its terms. Indeed, there is no reference to an actual contract in the Amended Complaint at all. Kasparov is left to plead a vague set of allegedly contractual circumstances. But Kasparov fails to allege who (on behalf of Kasparov) entered the agreement with Zacherl, whether the agreement was reduced to writing or formed by means of communications between Kasparov and Zacherl, and if so, whether those communications were in writing or oral, the dates of those communications, or what specifically was said. There is no specific allegation of an offer or an acceptance (or consideration for that

matter), and no allegations whatsoever to support a meeting of the minds as to the essential terms of the alleged agreement.

**Third**, Kasparov asserts that Zacherl was unjustly enriched by obtaining possession and control over the Wallets and the assets contained therein. However, Kasparov fails to allege any facts suggesting that the circumstances under which Zacherl was given signatory authorities gave rise to a legal or equitable obligation to repay or compensate Kasparov, as is required to state a claim for unjust enrichment. Indeed, there is no allegation Kasparov expected or demanded any compensation in return. And apart from a conclusory allegation that the benefit conferred is "measurable," Kasparov fails to adequately allege a measurable benefit as required under North Carolina law.

**Fourth,** Kasparov's fraud claims fail to adequately allege any of the elements of fraud and fall far short of satisfying the heightened pleading standard under Fed. R. Civ. P. 9(b). The most fundamental defect in Kasparov's fraud claim is the failure to allege any misrepresentation. The only specific communication Kasparov refers to in support of its fraud claim is a single electronic message from Zacherl, but Kasparov does not identify what statement in that message constitutes a misrepresentation. The misrepresentation Kasparov alleges – that Zacherl falsely represented that he would act as Kasparov's agent and not take actions without Kasparov's prior approval – is not contained anywhere in the quoted electronic message, nor does Kasparov specifically allege when or how Zacherl made such a representation. Rule 9(b) requires that Kasparov allege the time, place, and contents of any false representations, but Kasparov does none of those things. In the absence of any specifically plead misrepresentation, Kasparov's allegations as to the remaining elements of fraud – that the alleged misrepresentations were reasonably calculated to deceive Kasparov, made with the intent to deceive, reasonably relied upon, and directly caused damages –

are entirely conclusory and unsupported by any specific factual allegations supporting an inference of fraud. In particular, apart from conclusory allegations "on information and belief" that Zacherl intended to deceive Kasparov, Kasparov does not allege any facts supporting an inference of fraudulent intent as is required to state a claim for fraud under North Carolina law. Kasparov's constructive fraud claim likewise fails because it fails to allege any fiduciary duty. Finally, if the breach of contract claim were sustained, the fraud claims must be dismissed as duplicative.

*Fifth*, Kasparov's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") likewise fails because it omits critical elements. Because the primary purpose of the UDTPA is to provide consumers a private cause of action, North Carolina courts have interpreted the statute to reach business disputes in only two situations: (1) interactions between distinct businesses, and (2) interactions between businesses and consumers. The statute does not reach disputes within a business, and thus does not apply here, where Kasparov alleges it paid Zacherl for his services on behalf of its business, the Rook Project, and asserts claims related to those services. Kasparov's one-sentence attempt to allege an effect on commerce is vastly insufficient. Indeed, there is no allegation that Zacherl's conduct had any impact on any person or entity other than Kasparov (in Singapore), and thus there is likewise no allegation of any impact on North Carolina commerce, as required under the UDTPA. Finally, Kasparov does not adequately allege unfair or deceptive trade practices.

*Sixth,* Kasparov's remaining causes of action for civil conspiracy and declaratory relief fail for the simple reason that the other substantive causes of action fail.

For these reasons, and those set forth in further detail below, Zacherl's Motion to Dismiss should be granted and the Complaint should be dismissed in its entirety.

<u>**STATEMENT OF FACTS**</u>

**A.    KASPAROV ESTABLISHES THE ROOK PROJECT AND WALLETS.**

Kasparov alleges that Talo and Tiantian Kullander (along with his company, Amber) founded the Rook Project in late 2019, and subsequently incorporated Kasparov in Singapore on July 6, 2020, for purposes of administering the Project.  Amend. Compl. ¶¶ 5, 29, 32.  Kasparov alleges it has at all relevant times been owned by Talo and Kullander on a 50/50 basis.  *Id.* ¶ 21.  As detailed in the Complaint, Kasparov established and funded several cryptocurrency wallets to support the Project and its goals.  *Id.* ¶ 33.  Kasparov's claims against Zacherl principally relate to two wallets:  the Team Tokens Wallet (containing 452,137.53 ROOK Tokens and 1,186.94 tokens of Uniswap v2 LP (another type of cryptocurrency), and the Second Company Wallet (containing 714,144.85 in USDC, a cryptocurrency pegged to the U.S. dollar).  *Id.* ¶34.[2]

Both Wallets are "multi-signature wallets that required several individual approvals (sometimes referred to as 'signatures') from appointed/authorized individuals before any transaction to or from the Wallets could be consummated." *Id.* ¶ 11.  Initially, Kasparov designated the two principals of Talo and Amber (its owners) as the two signatories on both Wallets.  *Id.*

Kasparov alleged that it also set up a Distributed Autonomous Organization ("DAO") – an entity structure in which token-holders have the opportunity to participate in the management and decision-making of an entity – to run the Project, with "[a]ll decisions by the DAO . . . voted on

---

[2] In its Amended Complaint, Kasparov makes the scurrilous allegation that Zacherl "looted" the DAO Treasury Wallet.  It should be noted, however, that the DAO Treasury Wallet is *not* one of the two Wallets Kasparov alleges Zacherl improperly exercised control over. And, Kasparov does not base any of its causes of action on this allegation.  Kasparov acknowledges that, on or around August 1, 2021, it "voluntarily released control over the Project (and with it, the DAO Treasury Wallet) to public ROOK token holders" and that from that point forward, Kasparov no longer owned or controlled the assets in the DAO Treasury Wallet.  *Id.* ¶¶ 33(d)-35.

by ROOK token holders," and tokens distributed to "stakers" in proportion to the amount of assets they "stake" in the Project. *Id.* ¶¶ 6(a), 6(e).

**B.      KASPAROV COLLABORATES WITH ZACHERL ON THE WALLETS.**

Kasparov alleges that after founding the Project in late 2019, it "decided to collaborate with Defendants Zacherl, Linehan and Detz, who would work on various aspects of the Rook Project, including software development and marketing," and "lead certain trading elements in the Project, including the creation and operation of the Keepers that would consummate cryptocurrency arbitrage trades." *Id.* ¶¶ 7, 36. Pursuant to a Services Agreement entered into by Kasparov and Zacherl in or around April 2020, Kasparov agreed that Zacherl would receive 4% of the initial supply of tokens issued by the Project. *Id.* ¶ 8. Kasparov later agreed to pay Zacherl a salary of $10,000 per month as additional compensation for his services. *Id.* ¶ 37. The complaint alleges that pursuant to the Services Agreement, the Founders would retain ownership of the remaining ROOK tokens, which amounted to 960,000 ROOK tokens. *Id.* ¶ 8. Significantly, Kasparov does not allege the Founders' share of the initial tokens ever changed or that they no longer are entitled to that share.

Kasparov alleges that it agreed in June 2021, purportedly at Zacherl's recommendation, to engage Linehan to work on the Project, initially as an unpaid ambassador for the Project, and then later as an employee of the KeeperDAO with a $3,750 per month salary payable in USD Coin from the DAO Treasury Wallet. *Id.* ¶ 38. Likewise, Kasparov alleges that in July 2021, also purportedly at Zacherl's recommendation, it hired Detz to work on the Project as its External Affairs Lead, with a salary paid from the DAO Treasury Wallet. *Id.* ¶ 39.

Kasparov subsequently took several additional actions with respect to Zacherl, Linehan and Detz's roles in connection with the Project. ***First***, on October 13, 2021, and February 23,

2022, respectively, Kasparov added Zacherl and Linehan as signatories to the Second Company Wallet. *Id.* ¶¶ 42-43. As of around February 24, 2022, Kasparov alleges "there were six signatories to the Second Company Wallet: (1) Tiantian Kullander, (2) Taiyang Zhang, (3) Bainy Zhang, (4) Susruth Nadimpalli, (5) Zacherl, and (6) Linehan." *Id.* ¶ 44. **Second**, on October 13, 2021, and January 6, 2022, respectively, Kasparov added Zacherl and Linehan as signatories to the Team Tokens Wallet. As of January 2, 2022, Kasparov alleges "there were seven signatories to the Team Tokens Wallet: (1) Taiyang Zhang, (2) Tiantian Kullander, (3) Bainy Zhang, (4) Benjamin Wang, (5) Susruth Nadimpalli, (6) Zacherl, and (7) Linehan." *Id.* ¶¶ 49-50. **Third**, Kasparov alleges that it "authorized Zacherl and Linehan to manage 177,777.53 of the over 450,000 ROOK tokens in the Team Tokens Wallet at their own discretion, provided that such discretion was exercised in good faith, in the interests of the Project, and subject to Kasparov's control." Kasparov alleges the remaining ROOK tokens in the Team Tokens Wallet belonged to Kasparov. *Id.* ¶ 51. **Fourth**, Kasparov alleges that it added Detz as a signatory on the Team Tokens Wallet at the request of Zacherl on or around April 20, 2022. *Id.* ¶ 52.

In its Amended Complaint, Kasparov alleges that its communications with Zacherl concerning the use of the Wallets somehow resulted in the formation of a binding agreement. Specifically, Kasparov alleges that "[a]round October 2021, Kasparov offered Zacherl and Linehan the opportunity to be added as signatories to the Team Tokens Wallet as Kasparov's agents, *i.e.,* on the condition that Zacherl and Linehan utilize such signatory authority subject to Kasparov's control and prior authorization, and for the benefit of the Rook Project." Further, Kasparov alleges that "[i]n exchange for good and valuable consideration, Zacherl and Linehan accepted." *Id.* ¶ 81. Likewise, Kasparov alleges that "Zacherl and Linehan agreed that Kasparov would afford Zacherl and Linehan signatory authority over the Second Company Wallet as

Kasparov's agent." *Id. ¶* 83. However, the Amended Complaint is wholly devoid of any specific communication whereby Zacherl agreed to serve as Kasparov's agent or to not exercise his signatory authority without Kasparov's prior approval, let alone any document reflecting such an agreement.

The Amended Complaint also introduces an allegation that Kasparov was fraudulently induced to make Detz a signatory to the Wallets by virtue of an electronic message exchange on or around April 20, 2022. *Id*. ¶ 102–108. As discussed in further detail below, there is no allegation that any aspect of Zacherl's April 20, 2022 message to Kasparov was untrue, much less fraudulent. Nor is there any allegation of a specific representation or promise by Zacherl that if Detz was added as a signatory, he would only act on behalf of Kasparov or as its agent.

## C.  KASPAROV ALLEGES ZACHERL MADE CHANGES TO THE WALLETS.

Kasparov's claims against Zacherl arise from allegations that Zacherl took certain actions that increased his (and Linehan and Detz's) – and diluted Kasparov's – degree of control over the Wallets. However, there are no allegations in the Complaint that Zacherl, or anyone else, ever diverted assets from the Wallets, nor that there was any change whatsoever to the assets contained in the Wallets as a result of any action taken by Zacherl. Simply put, there is no allegation that any of Kasparov's assets were stolen or diminished. Kasparov alleges two categories of actions that it contends were unlawful.

### 1.  The Addition and Removal of Wallet Signatories.

Kasparov alleges that Zacherl, Linehan and Detz removed signatories aligned with Kasparov, and added signatories who were their "agents." Specifically, Kasparov alleges that on or around June 7, 2022, "using their authority as signatories, Zacherl, Linehan and Detz conspired to create and execute a plan through which (1) Benjamin Wang, (2) Susruth Nadimpalli, and (3)

Bainy Zhang, each of whom were representatives and/or associates of Kasparov, were removed as signatories on the Team Tokens Wallet," and to at the same time "have van Rheeden, who acted as their agent and who is not affiliated with Kasparov, added as a signatory to the Team Tokens Wallet." *Id.* ¶¶ 53-54. As a result of these changes – and the death of a Kasparov-aligned signatory, Tiantian Kullander – Kasparov alleges that only one of the original Kasparov signatories (Taiyang Zhang) remains a signatory. *Id.* ¶ 56. "[B]ecause three signatories are needed to conduct any transactions using the Team Tokens Wallet," and only one Kasparov signatory remains after Kullander's passing, Kasparov alleges that Zacherl, Linehan, Detz "and their agent, van Rheeden . . . have a sufficient numerical bloc to control the Wallet, to the exclusion of Kasparov." *Id.*

Kasparov asserts similar allegations with respect to the Second Company Wallet. Kasparov alleges that on or around July 5, 2022, "Zacherl and Linehan . . . removed (1) Bainy Zhang and (2) Susruth Nadimpalli as signatories on the Second Company Wallet, leaving only Tiantian Kullander and Taiyang Zhang as the only remaining Kasparov-affiliated signatories on the Second Company Wallet," and on the same day, "added Detz and van Rheeden as additional signatories to the Second Company Wallet." *Id.* ¶ 61. Kasparov alleges "[t]his gave Zacherl, Linehan, and their agents four confirmatory signatures, while only two Kasparov-affiliated signatories remained." *Id.* Kasparov alleges that it did not approve these changes to the Wallet signatories, and that as a result of these changes, "Kasparov no longer has access to its funds" in the Wallets. *Id.* ¶¶ 60, 65-66.

### 2. Change to the Signatory Confirmation Security Protocol for the Second Company Wallet.

Kasparov alleges that on or around July 5, 2022, "Zacherl and Linehan, knowing that only two of the original Kasparov-affiliated signatories remained, changed the signatory confirmation security protocol applicable to the Second Company Wallet to now require a minimum of three

confirmatory approvals from registered signatories. In so doing, Zacherl and Linehan sought to prohibit the two remaining Kasparov-affiliated signatories from gaining access to or controlling the Second Company Wallet." As a result, Kasparov alleges that "Zacherl, Linehan and their agents, with a total of four signatories, ensured that they would be able to maintain control of Kasparov's Second Company Wallet, wrongly excluding Kasparov." *Id.* ¶ 62. Kasparov alleges it did not approve these changes to the Second Company Wallet (*id.* ¶ 65).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level and have enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). A court need not accept conclusory allegations regarding the legal effect of the facts alleged or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citation omitted).

"[F]raud-based claims must satisfy Rule 9(b)'s heightened pleading standard. . . Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (quoting Fed. R. Civ. P. 9(b)). The heightened pleading standard for fraud-based claims is "stringent" for the purposes of "providing defendants notice of their alleged misconduct, preventing frivolous suits, and eliminating fraud actions in which all the facts are learned after discovery." *Id.* at 197.

## ARGUMENT

Each of the causes of action in the Amended Complaint are based on the same alleged misconduct—namely, the changes to the Wallet signatories described in Section C, *supra*. Kasparov's allegations fail to state a claim.

## A.  KASPAROV'S CONVERSION CLAIM FAILS.

"To state a claim [for] conversion under North Carolina law,[3] [a] plaintiff must allege the 'unauthorized assumption and exercise of the right of ownership over **goods or personal chattels** belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Kehrer v. Fields*, No. 5:11-CV-260-FL, 2011 WL 6965714, at *11 (E.D.N.C. Nov. 21, 2011) (quoting *Spinks v. Taylor,* 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981)) (emphasis added). "Conversion is limited to claims involving goods and personal property and does not include interests such as business opportunities and expectancy interests." *Id.* (internal quotations omitted).  North Carolina courts have defined "intangible assets" broadly:  "An 'intangible asset' is an asset that is not a physical object[.]"  *Flexible Foam Prods., Inc. v. Vitafoam Inc.*, 980 F. Supp. 2d 690, 700 (W.D.N.C. 2013) (internal quotations omitted).

---

[3] "Under the lex loci test, tort claims are governed by the law of the place of injury, which is sustained in the jurisdiction where the last act giving rise to the injury occurred." *Cardiorentis AG v. IQVIA Ltd.*, 373 N.C. 581, 321, 837 S.E.2d 873, 880 (2020).  Likewise, "[u]nder North Carolina's choice-of-law rules for claims sounding in contract, North Carolina adopts the rule of *lex loci contractus*, which focuses on the state where the contract was formed."  *Smith Bros. Trucking of Mt. Airy v. Baker Truck Brokerage, Inc.*, No. 1:07-CV-623, 2008 WL 4681641, at *3 (M.D.N.C. Oct. 21, 2008).  Kasparov does not specifically allege that any of the acts giving rise to its claims occurred in North Carolina, apart from the general allegation that Zacherl resides in North Carolina.  However, Zacherl accepts for purposes of this motion that North Carolina law applies to Kasparov's claims.  In the event Kasparov contests the application of North Carolina law to one or more of its causes of action, Zacherl reserves the right to seek a stay or dismissal based on *forum non conveniens*.  *See id.* at 320 ("State and federal courts alike agree that the need to apply foreign law favors a stay in a *forum non conveniens* analysis").

Accordingly, courts have routinely dismissed conversion claims based only on intangible interests or rights, and not "goods and personal property." For example, in *Surratt v. Brown*, the court found plaintiff's conversion claim based on "his right to partnership property, his membership interest in the LLC/Partnership, and his right to participate in management of the LLC/Partnership" was based on "intangible" interests and thus could not form the basis for a conversion claim. No. 15 CVS 1551, 2015 WL 4523291, at *7 (N.C. Super. July 27, 2015). *See also, e.g., Kamel v. 5Church, Inc.* No. 3:17-cv-507-RJC-DCK, 2019 WL 4024252, at *17 (W.D.N.C. Aug. 23, 2019) (finding claim for conversion of "administrative rights to the email domains" was based on "intangible interests that may not be the subject of a conversion claim").

Kasparov's conversion claim fails because it is not based on an allegation that any of the digital assets (*i.e.* the ROOK tokens and other cryptocurrencies) contained in the Wallets were taken, diverted, diminished or misused. Instead, it is based exclusively on alleged changes to the Wallet signatories described in Section C, *supra*, which Kasparov alleges "deprived Kasparov from control over its Wallets and the digital assets contained therein." *See* Amend. Compl. ¶¶ 73-79. Kasparov's allegations of interference with its rights with respect to, or degree of control over, the Wallets involve the kinds of intangible interests that North Carolina courts have recognized cannot support a conversion claim.

Even if Kasparov were to allege some facts suggesting interference with the digital assets in the Wallets – as opposed to merely interference with Kasparov's *control* over the Wallets and assets contained therein – its claim would still fail. The assets contained in the Wallets are ROOK Tokens and cryptocurrency, and courts have recognized digital assets as intangible property. *See Ox Labs Inc. v. BitPay, Inc.*, 848 F. App'x 795, 796 (9th Cir. 2021) ("The California Supreme Court has yet to decide whether Bitcoins can be specifically recovered in a conversion action.

Based on our review of California authorities, however, we conclude that they cannot. Specific recovery is unavailable when the converted property is intangible."); *Jeong v. Nexo Fin. LLC*, No. 21-CV-02392-BLF, 2022 WL 174236, at *24 (N.D. Cal. Jan. 19, 2022) (referring to "cryptocurrencies" as "intangible goods"); *Currier v. PDL Recovery Grp.*, LLC, No. 14-12179, 2018 WL 4057394, at *2 (E.D. Mich. Aug. 27, 2018) (finding defendant's "cryptocurrency accounts with Coinbase" to be "intangible personal property"); *Alexander v. BF Labs Inc.*, No. 14-2159-KHV, 2014 WL 5406890, at *1 (D. Kan. Oct. 22, 2014) ("A Bitcoin is a unit of intangible currency that exists only on the internet").

Assuming *arguendo* the digital assets are tangible property, courts have required conversion of money claims to include "allegations or evidence of a transfer of a specific amount of money from a plaintiff to a defendant, with the defendant taking possession of that specific, identifiable amount." *Taylor v. Bettis*, 976 F. Supp. 2d 721, 744 (E.D.N.C. 2013), *aff'd*, 693 F. App'x 190 (4th Cir. 2017). *See also Wake Cnty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 653, 762 S.E.2d 477, 490 (2014) (affirming dismissal of conversion claim over "a category of monies allegedly owed" where the county failed to establish "the funds' specific source, specific amount, and specific destination"). Moreover, where a "Plaintiff seeks to maintain a conversion claim for money" it must identify "any specific payment it made to Defendant by amount or date, or otherwise sufficiently identif[y] the money alleged to have been converted." *Progress Point One-B Condo. Ass'n, Inc. v. Progress Point One Prop. Owners Ass'n, Inc.*, No. 14 CVS 467, 2015 WL 859833, at *3 (N.C. Super. Mar. 2, 2015). Once again, there are no allegations that Kasparov

transferred any digital assets to Zacherl, or that Zacherl transferred Kasparov's digital assets to himself or anyone else for their own use.[4]

## B. KASPAROV'S BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT CLAIMS FAIL.

Kasparov fails to allege either the existence or breach of a contract. After omitting any allegation whatsoever of an agreement between Kasparov and Zacherl concerning the "use of the" Wallets in its original Complaint, Kasparov now claims that it formed such an agreement based on threadbare allegations which are insufficient to state a claim under North Carlina law. "In North Carolina . . . [t]o make a claim for breach of contract, a party must show the existence of an agreement, an obligation contained in that agreement that has not been fulfilled by the opposing party, and resulting injury to the non-breaching party." *Pres. Pro. Servs., LLC v. M2 Pictures, LLC*, No. 3:14-CV-589-RJC-DCK, 2015 WL 3657463, at *3 (W.D.N.C. June 12, 2015). "It is well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." *Id.*

Where a plaintiff asserts a breach of contract claim without pleading any specific facts to support the formation of a valid contract, courts have found that the plaintiff fails to state a cause of action. "The Court is not required to accept Plaintiff's conclusory claim that the parties formed an 'oral contract' in the absence of some factual allegations to support such a conclusion." *Regency Centers Acquisition, LLC v. Crescent Acquisitions, LLC*, No. 17 CVS 11354, 2018 WL 562749, at *7 (N.C. Super. Jan. 24, 2018) ("Plaintiff does not plead any specific facts in support of Defendant's alleged oral acceptance of the purchase price, such as the date of the acceptance").

---

[4] As noted above, Kasparov's allegations that Zacherl "looted" the DAO Treasury Wallet relate to assets that are not owned or controlled by Kasparov, but rather by the DAO, and thus cannot form the basis for a conversion claim. In any event, Kasparov concedes that point in omitting any reference to those allegations in its cause of action for conversion.

The breach of contract allegations in *Pres. Pro. Servs., LLC* are similar to those asserted here. There, the court noted that "Plaintiffs assert that the entirety of the contract can be found in the vague statement alleged by the Amended Complaint, that 'HGTV and M2 promised PresPro that, in exchange for work on FIF, PresPro would be featured in FIF episodes as the general contractor on some of the homes and that Defendants would promote PresPro on FIF.'" *Pro. Servs., LLC*, 2015 WL 3657463 at *3 (quoting the complaint). Dismissing the breach of contract claim, the court found that "even viewing Plaintiffs' Amended Complaint in the light most favorable to the Plaintiffs . . . the Complaint does not include plausible allegations that Defendants breached the terms of a valid and enforceable contract" and Plaintiffs "do not . . . point to specific factual allegations in the Amended Complaint to demonstrate that such a contract was created between the parties." *Id. See also Levy v. Infilaw Corp.*, No. 3:17-CV-00026-GCM, 2017 WL 3573825, at *3 (W.D.N.C. Aug. 17, 2017) ("Plaintiffs herein do not identify any written contract and provide no meaningful substance (or even the date) of any such alleged agreement. Plaintiffs' conclusory allegations contain no factual content of any specific promises . . . ."). The same is true here.

Courts have likewise dismissed breach of contract claims where the plaintiff "fail[s] to show a meeting of the minds as to the essential terms." *Al-Jamal v. Michael Baker Corp.*, No. 5:12-CV-746-F, 2013 WL 3356573, at *4 (E.D.N.C. July 3, 2013). *See also Guiliani v. Duke Univ.*, No. 1:08CV502, 2010 WL 1292321, at *6 (M.D.N.C. Mar. 30, 2010) ("This court finds that Plaintiff's claim for breach of contract based on . . . oral statements does not meet the pleading requirements of *Iqbal* because the statements do not show a meeting of the minds . . . nor do they establish definite and certain terms"); *Charlotte Motor Speedway, LLC v. Cnty. of Cabarrus*, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013) (the agreement's "silence on several key terms renders

it void for indefiniteness and that, for this reason, the trial court correctly granted the County's motion to dismiss as to Plaintiffs' claims for breach of contract").

Kasparov alleges a contract was formed when Kasparov offered to make Zacherl and Linehan signatories to the Wallets "as Kasparov's agents, *i.e.*, on the condition that Zacherl and Linehan utilize such signatory authority subject to Kasparov's control and prior authorization, and for the benefit of the Rook Project," and Zacherl accepted the offer. Amend. Compl. ¶¶ 81, 83. The Amended Complaint is wholly devoid of any allegation that this agreement was ever reduced to writing, much less that an agreement was formed as a result of oral or written communications with Zacherl, and if so, the dates of those communications, who was involved (including who acted or spoke on behalf of Kasparov),[5] or what specially was said. The Amended Complaint fails to identify a single statement by Zacherl agreeing to act as Kasparov's agent or not to take any actions without Kasparov's prior approval. Aside from general allegations that Zacherl agreed to act as Kasparov's agent with respect to the Wallets, the Amended Complaint is silent as to the scope and duration of the agreement and Zacherl's obligations thereunder. Thus, Kasparov fails to allege any meeting of the minds as to the essential terms of the alleged agreement. Moreover, Kasparov's allegation of a breach is based on acts Zacherl took as a signatory that Kasparov alleges were outside the bounds of his agreement to act as Kasparov's agent and were taken without Kasparov's prior authority. *Id.* ¶¶ 85-86. In the absence of any allegation that Zacherl ever agreed that he would not take any action with respect to the Wallets without Kasparov's prior approval, Kasparov cannot allege that actions taken without Kasparov's approval constitute a breach. Thus,

---

[5] The Amended Complaint refers to an agreement involving "Kasparov, Zacherl and Linehan," but fails to identify which principal acted or spoke on behalf of Kasparov. *See* Amend. Compl. ¶¶ 81, 83.

Kasparov fails to allege the formation of a valid contract or a breach of any identifiable and agreed to obligation.

If Kasparov's breach of contract claim is dismissed, its breach of implied covenant of good faith and fair dealing claim must also be dismissed. "A breach of the implied covenant of good faith and fair dealing requires the wrongful intent of a party to deprive another party of its contractual rights . . . . Thus, the existence of a valid contract is a prerequisite to a claim for breach of the implied covenant of good faith and fair dealing." *Herrera v. Charlotte Sch. of L., LLC*, No. 17 CVS 1965, 2018 WL 1902556, at *10 (N.C. Super. Apr. 20, 2018).

## C.    KASPAROV'S UNJUST ENRICHMENT CLAIM FAILS.

"Under North Carolina law, unjust enrichment is an equitable doctrine that allows for the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Augustson v. Bank of Am., N.A.*, 864 F. Supp. 2d 422, 438 (E.D.N.C. 2012) (internal quotations omitted). "[U]nder North Carolina law, a benefit is unjust when the benefit was conferred under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." *Id.* at 438–39 (internal quotations omitted). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, the benefit must be measurable, and the defendant must have consciously accepted the benefit." *Town of Carolina Shores v. Cont'l Ins. Co.*, No. 7:10-CV-13-D, 2010 WL 4338437, at *4 (E.D.N.C. Oct. 26, 2010) (internal quotations omitted).

Kasparov's unjust enrichment claim is defective as plead for three reasons. *First*, Kasparov utterly fails to allege a critical element of unjust enrichment—that a benefit was conferred "under circumstances which give rise to a legal or equitable obligation on the part of the defendant to

account for the benefits received." *Town of Carolina Shores*, 2010 WL 4338437, at *4 (internal quotations omitted). Kasparov alleges that "[t]hrough the unapproved changes Zacherl and his co-conspirators implemented to the signatories associated with the Team Tokens Wallet and the Second Company Wallet, a measurable benefit has been conferred on Zacherl: namely, possession and control of the digital assets in the Wallets." Amend. Compl. ¶ 97. Further, Kasparov alleges that Zacherl's status as a signatory gives him the "power to transfer, spend, or further restrict these significant assets, as well as to prevent Kasparov [from] utilizing its voting rights." *Id.* Kasparov alleges that "it would be inequitable to permit Zacherl" to maintain the alleged benefits (Compl. ¶ 100), but does not allege (i) that Zacherl is obligated to repay or compensate Kasparov as a result of obtaining the alleged benefit, (ii) any circumstances giving rise to such an obligation, or (iii) what amount of compensation is owed. There is no allegation that Kasparov expected or demanded payment of any kind in exchange for any "benefit" Kasparov allegedly provided to Zacherl. Moreover, Kasparov does not allege that it *conferred* the benefit of control over the Wallets on Zacherl, but rather that Zacherl seized and maintained control over Kasparov's objection (and, in doing so, breached his oral agreement with Kasparov and engaged in fraud). *See id.* ¶¶ 99, 81-88, 102-108.

**Second**, the unjust enrichment claim is defective because Kasparov fails to allege a *measurable* benefit. Kasparov alleges that the "possession and control of the digital assets in the Wallets," and the "power" to take certain actions with respect to the assets, constitute a "measurable benefit." Compl. ¶ 97. This assertion is entirely conclusory, and the alleged benefit – "possession and control" and "power" over assets, but *not* "ownership" of the Wallets or assets, which "are owned by Kasparov" (*see id.* ¶ 98) – is akin to the "nebulous" benefits courts have found insufficient. *See Campbell Sales Grp., Inc. v. Niroflex by Jiufeng Furniture*, LLC, No. 19

CVS 865, 2022 WL 17413381, at *10 (N.C. Super. Dec. 5, 2022). Moreover, Kasparov does not allege Zacherl used his "possession and control" or "power" over the digital assets to transfer them to himself or others or to otherwise enrich himself in any way, and thus it is entirely vague how the alleged "possession and control" or "power" constitutes a measurable benefit.

**Third**, to the extent Kasparov's breach of contract claim is not dismissed, the unjust enrichment claim must be dismissed as duplicative. *See Great Am. Emu Co., LLC v. E.J. McKernan Co.*, 509 F. Supp. 3d 528, 538 (E.D.N.C. 2020).

## D.    KASPAROV'S ACTUAL AND CONSTRUCTIVE FRAUD CLAIMS FAIL.

Kasparov's fraud claims fall far short of satisfying the heightened pleading standard under Fed. R. Civ. P. 9(b). "Under North Carolina law, the elements of fraud are (1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party." *Freeman v. HKA Enterprises of S.C., LLC*, No. 4:21-CV-77-FL, 2022 WL 3705020, at *9 (E.D.N.C. Aug. 26, 2022) (internal quotations omitted). "To satisfy the specificity requirements of Rule 9(b), it is pleader's obligation to plead the time, place, and contents of the false representations, as well as the identity of the person making the representation and what such person obtained thereby." *Suntrust Mortg., Inc. v. Busby*, 651 F. Supp. 2d 472, 484 (W.D.N.C. 2009). Courts have routinely dismissed fraud claims on the basis that the alleged misrepresentation was not plead with particularity. *See Watkins v. Soprema, Inc.*, No. 1:12CV318, 2013 WL 1727460, at *4 (W.D.N.C. Mar. 27, 2013) ("[T]he circumstances constituting the fraud are not pled with the required specificity as the Complaint fails to even allege to whom this statement was made and when it was made."); *Dellinger v. Pfizer Inc.*, No. 5:03CV95-V, 2004 WL 6234780, at

*4 (W.D.N.C. July 7, 2004) ("Plaintiff has not alleged the 'who, what, where, why and when' that pertain to his specific claim.").

The fraud claim fails because it widely misses the mark of satisfying Rule 9(b) because it fails to allege any misrepresentation, let alone with particularity. Kasparov's actual fraud claim is based solely on alleged misrepresentations by Zacherl in an April 20, 2022 message to the two principals of Kasparov. The message is quoted in the Amended Complaint as follows: "[n]eed a few signatures today please. Payments from strategic reserve → to 4 keepers from pilot program integration bounties[,]" and "[i]f you guys can help knock out the first one we can polish off the rest." Kasparov alleges that one of its principals responded "done." Amend. Compl. ¶ 102. A screenshot of the referenced message exchange is included below:



**JZ**     21:45
@hazard_KD @taiyangzhang @ttk36

Need a few signatures today please. Payments from strategic reserve –
> to 4 ==keepers== from pilot program integration bounties.

https://gnosis–
safe.io/app/eth:0xB81F5B9bD373b9d0Df2e3191A01b8fA9b4d2832A/t
ransactions/queue

If you guys can help knock out the first one we can polish off the rest.

**TT**     21:47
Done~

**JZ**     21:48
Thanks 👍

The Amended Complaint states that "[t]hrough this communication, Zacherl offered to conduct three of the four transactions on behalf of Kasparov if Zacherl's co-conspirator Detz was added as a signatory to the Team Tokens Wallet by Kasparov." *Id*. But Kasparov does *not* allege that Zacherl failed to "conduct three of the four transactions on behalf of Kasparov." Rather, Kasparov alleges that in reliance on Zacherl's message, it "added Detz as a signatory to the Teams Tokens Wallet so that Zacherl, Detz, and Linehan could conduct transactions on behalf of Kasparov and subject to Kasparov's control." *Id*. However, the quoted message from Zacherl contains nothing of the sort. And, there is nothing misleading about the message. It clearly does not state that if Kasparov makes Detz a signatory, Zacherl, Linehan and Detz will only use their authority to conduct transactions on behalf of and with prior approval from Kasparov. There is no allegation Zacherl ever made such a representation, and the quoted message certainly does not contain any such statement.

In the absence of any allegation that Zacherl ever made the statement that Kasparov claims as the basis for its fraud claim, Kasparov also fails to adequately allege any of the other elements of fraud, which are dependent on there being allegations of a specific misrepresentation. Kasparov alleges that "Zacherl's statements were reasonably calculated to deceive Kasparov" based on the "relationship of trust and confidence between Kasparov and Zacherl." Amend. Compl. ¶ 104. However, there is no allegation that any statement in Zacherl's message was deceptive, and thus Kasparov cannot allege that Zacherl's message was reasonably calculated to deceive Kasparov.

Courts have also routinely dismissed fraud claims for failure to adequately plead intent to defraud. *See Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 594 (M.D.N.C. 2003) ("[M]ere generalities and conclusory allegations of fraud will not suffice to sustain a fraud claim" and "[t]hus, where a plaintiff does nothing more than assert that [a promissor] never intended to

honor its obligations under [an] agreement, dismissal as a matter of law is appropriate.") (internal quotations omitted). While allegations of intent to defraud may be plead on information and belief, the complaint must nevertheless "adduce specific facts supporting a strong inference of fraud." *In re Cree, Inc. Sec. Litig.*, No. 1:03CV00549, 2005 WL 1847004, at *3 (M.D.N.C. Aug. 2, 2005) (internal quotations omitted). *See also Sasser v. Safe Home Sec., Inc.*, No. 1:18CV746, 2019 WL 3858607, at *3 (M.D.N.C. Aug. 16, 2019) ("[a]ssertions 'upon information and belief' that services were never provided or intended to be provided, along with a general assertion of intent to deceive, do not alone or in combination create a reasonable inference of intentional misrepresentation"); *Packrite, LLC v. Graphic Packaging Int'l, Inc.*, No. 1:17CV1019, 2018 WL 4112827, at *5 (M.D.N.C. Aug. 29, 2018) ("Beyond these conclusory allegations" of fraudulent intent alleged on information and belief, "Packrite fails to allege any additional facts demonstrating that at the time the statements were made, Graphic had no intention of honoring its promise"). Apart from the conclusory allegations on information and belief that Zacherl "never intended to solely execute these three transactions on Kasparov's behalf" and instead "intended to misappropriate the digital assets," and that he "made these statements knowing them to be false with the intent to deceive Kasparov," Kasparov does not make a single specific allegation supporting an inference of fraud. *See* Amend. Compl. ¶¶ 103, 105.

Kasparov also fails to allege reasonable reliance on Zacherl's message, apart from the conclusory assertion that "[r]easonably relying on Zacherl's false representations, Kasparov gave Detz signatory authority." *Id.* ¶ 106. "A party cannot establish justified reliance on an alleged misrepresentation if the party fails to make reasonable inquiry regarding the alleged statement." *Freeman*, 2022 WL 3705020, at *9. As set forth above, Zacherl's message does not contain any promise that he would serve as Kasparov's agent. And there is no allegation that Kasparov ever

sought to clarify what Zacherl's message meant, to the extent there was any ambiguity. Nor is there any allegation explaining why it was reasonable for Kasparov to assume that Zacherl would act as its agent in exchange for Detz being made a signatory given that there is no allegation Zacherl ever made any such representation.

Kasparov also fails to adequately allege the final element of fraud—that the alleged misrepresentation caused damages. In order to state a claim for fraud, Kasparov must establish proximate causation. *See Jay Grp., Ltd. v. Glasgow*, 139 N.C. App. 595, 601, 534 S.E.2d 233, 237 (2000). Proximate causation "requires proof first of causation-in-fact: that 'but for' the act or omission charged, the injury claimed would not have occurred." *Red Cardinal Fifteen, Inc. v. Lange*, 106 F.3d 391, at *4 (4th Cir. 1997). Kasparov makes the conclusory assertion that its damages were "a direct and proximate result of Zacherl's false representations." Compl. ¶ 108. This type of conclusory assertion of causation is deficient as a matter of law. Moreover, Kasparov acknowledges that there were intervening events between the alleged misrepresentation and the alleged injury, including in particular Kullander's passing, which Kasparov acknowledges occurred after Zacherl's April 20, 2022 message and resulted in the dilution of Kasparov's control over the Team Tokens Wallet.[6] Thus, Kasparov's allegation that Zacherl's alleged misrepresentation was the proximate cause of its loss of control over the Team Tokens Wallet, which is the only injury Kasparov claims in connection with its fraud claim, is belied by other allegations acknowledging that other causes contributed to that injury. *See Arnesen v. Rivers Edge*

---

[6] Kasparov alleges Zacherl sent his April 20, 2022 message to "the two principals of Kasparov, Tiantian Kullander and Taiyang Zhang," indicating the message was sent before Kullander's passing. Amend. Compl. ¶ 14. Kasparov alleges that as a result of "Kullander's recent passing, only one of the original [Kasparov-affiliated] signatories—Taiyang Zhang—is still a signatory," suggesting that Kasparov's control over the Team Tokens Wallet was diluted as a result of Kullander's passing. *Id.* ¶ 56.

*Golf Club & Plantation, Inc.*, 368 N.C. 440, 441, 781 S.E.2d 1, 3 (2015) ("[B]ecause plaintiffs fail to sufficiently allege . . . that plaintiffs' injuries were proximately caused by either the bank or the appraisers, dismissal is proper"); *Thompson v. Bank of Am.*, No. 7:09-CV-89-H, 2011 WL 13151658, at *10 (E.D.N.C. Feb. 24) ("Plaintiffs' have not properly alleged reliance or proximate cause").

In the event the breach of contract claim is not dismissed, the actual fraud claim must be dismissed for the additional reason that it is duplicative of the breach of contract claim. *See Norman*, 286 F. Supp. 2d at 594 ("the mere failure to carry out a promise in contract does not support a tort action for fraud"). Kasparov's fraud and breach of contract claims are based on the same premise that Kasparov agreed to grant signatory authorities in exchange for Zacherl's alleged promise that he would act as Kasparov's agent, and are therefore duplicative.

Kasparov's constructive fraud claim also fails to satisfy the heightened pleading standard under Rule 9(b). *Lawley v. Liberty Mut. Grp., Inc.*, No. 5:11-CV-00106-RLV, 2012 WL 4513622, at *5 (W.D.N.C. Sept. 28, 2012) ("constructive fraud claims must comply with Rule 9(b)"). "To state a claim for constructive fraud, a party must allege (1) the existence of a fiduciary duty; and (2) a breach of that duty." *Vinal v. Fed. Nat'l Mortg. Ass'n*, No. 7:13-CV-159-D, 2014 WL 11996967, at *4 (E.D.N.C. Feb. 14, 2014) (internal quotations omitted). "[A]s is required by well-established North Carolina law, detailed factual allegations, rather than mere conclusory assertions, are necessary to demonstrate the existence of a fiduciary relationship as a matter of fact." *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 600, 821 S.E.2d 711, 726 (2018) (affirming dismissal of constructive fraud claim based on failure to adequately allege fiduciary duty). *See also Herrera v. Charlotte Sch. of L., LLC*, No. 17 CVS 1965, 2018 WL 1902556, at *12 (N.C. Super. Apr. 20, 2018) ("Because Plaintiffs have failed to allege a basis to find that the CSL

Defendants owed Plaintiffs a fiduciary duty, Plaintiffs' claims for constructive fraud must be dismissed."). Kasparov does not allege that Zacherl owes any fiduciary duty to it, nor does the term "fiduciary duty" appear anywhere in the Amended Complaint. Kasparov also fails to allege any facts that give rise to fiduciary duties. On the contrary, Kasparov alleges that it agreed to pay "compensation" to Zacherl for his services, thus suggesting that he was akin to an employee. *See* Amend. Compl. ¶ 37. "North Carolina's courts have consistently held that an employer-employee relationship is not a fiduciary one, even where the employee has significant management authority." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, No. 17 CVS 7304, 2018 WL 4902003, at *4 (N.C. Super. Oct. 9, 2018). The constructive fraud claim should be dismissed.

## E.  KASPAROV'S DECEPTIVE TRADE PRACTICES CLAIM FAILS.

Kasparov's claim under N.C. Gen. Stat. § 75-1.1 *et seq.*, North Carolina's Unfair and Deceptive Trade Practices Act, suffers from insurmountable defects. To state a claim under the UDTPA, one must allege three elements: "(1) the defendant committed an unfair or deceptive act or practice (2) that was in or affecting commerce and (3) proximately caused injury." *Stack v. Abbott Lab'ys, Inc.*, 979 F.Supp.2d 658, 667 (M.D.N.C. 2013). A plaintiff asserting claims under the UDTPA "must allege facts that support each element of the claim in terms that are not vague or conclusory." *Maxwell v. Phillips*, No. 1:06CV00510, 2007 WL 2156337, at *7 (M.D.N.C. July 25, 2007). A plaintiff "must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991). Failure to allege facts meeting the "affecting commerce" requirement alone compels dismissal. *See id.*, 328 N.C. at 592-93, 403 S.E.2d at 492-494 (affirming dismissal for failure to meet "affecting commerce" requirement). Kasparov falls far short of alleging sufficient facts to satisfy the "affecting commerce" element, and North

Carolina precedent concerning that element demonstrates that Kasparov's attempt to assert a claim under the UDTPA is an attempt to fit a square peg in a round hole.

The "affecting commerce" requirement strictly circumscribes the type of business activity covered by the UDTPA. Courts have repeatedly emphasized that the UDTPA "is not intended to apply to all wrongs in a business setting." *See, e.g., Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 519 (4th Cir. 1999); *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F. Supp. 3d 1011, 1021 (E.D.N.C. 2015), aff'd, 674 F. App'x 250 (4th Cir. 2016). Rather, "the North Carolina Supreme Court explained that the UDTPA was intended to apply to two situations: "(1) interactions *between businesses*, and (2) interactions *between businesses and consumers*." *Stack,* 979 F.Supp.2d at 667 (quoting *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010)) (emphasis added).[7] "Consequently, 'any unfair or deceptive conduct contained solely within a single business is not covered by the Act.'" *Id.* (quoting *White*, 364 N.C. 47 at 53, 691 S.E.2d at 680). "For this reason, North Carolina courts have generally exempted disputes arising from the employer-employee relationship from the UDTPA because they do not affect commerce." *Id. See also White*, 364 N.C. at 53, 691 S.E.2d at 680 (finding that the UDTPA does not extend to a business's "internal operations" or to the "internal conduct of individuals within a single market participant, that is, within a single business" and that "the General Assembly intended the Act's provisions to apply to interactions between market participants"). Accordingly, courts routinely dismiss claims under

---

[7] The narrow application of the UDTPA is consistent with the "primary purpose" of the statute, which is "to provide a private cause of action for consumers." *Durling v. King*, 146 N.C.App. 483, 488, 554 S.E.2d 1, 4 (2001); *see also Food Lion*, 194 F.3d at 520 ("[T]he fundamental purpose of the UTPA is to protect the consumer, and courts invariably look to that purpose in deciding whether the Act applies.").

the UDTPA that are intra-business disputes between an employer and employee, or among partners within a single business.[8]

This dispute is between a corporate entity (Kasparov), which was formed to administer the Rook Project, and an individual who is compensated by that entity for his services in relation to the Rook Project pursuant to a Services Agreement (Zacherl). Amend. Compl. ¶¶ 36-37. Kasparov also alleges misconduct by Linehan and Detz, who likewise are paid salaries by Kasparov for their services in relation to the Rook Project. *Id.* ¶ 9. This is precisely the kind of intra-business dispute that cannot form the basis for a claim under UDTPA. Kasparov's assertion that the allegations in the Amended Complaint "concern a dispute between two different market participants, not an intra-entity dispute," *id.* ¶ 122, is conclusory and, in any event, the fact that Zacherl and Kasparov are distinct from one another does not mean that the dispute is not an intra-business dispute. Kasparov cannot argue that the acts taken by Zacherl that form the basis for the Complaint were not taken in connection with Kasparov's business, namely, the operation of the Project and Wallets, particularly in light of Kasparov's allegation that Zacherl agreed to act as its agent.

---

[8] *See e.g.*, *Wilson v. Blue Ridge Elec. Mbrshp. Corp.*, 157 N.C. App. 355, 358, 578 S.E.2d 692, 694 (2003) (changing corporate bylaws to affect the composition of the corporation's management was an internal business activity that did not affect commerce); *White*, 364 N.C. at 53-54, 691 S.E.2d at 680 (a dispute among business partners did not affect commerce where, among other things, the defendant partner had improperly diverted work and financial opportunities away from plaintiff partners to a group of men with whom he preferred to work); *Stuart*, 2019 WL 13217414, at *2 (dismissing UDTPA claim because employee failed to allege facts showing employer's acts impacted "other market participants or customers"); *Durling*, 146 N.C.App. at 488-489, 554 S.E.2d at 4-5 (a dispute between a sales representative and his sub-representatives over the allocation of commissions did not affect commerce); *Maxwell*, 2007 WL 2156337, at *7 (dismissing UDTPA claim because dispute over allocation of royalties among former band members did not affect commerce); *Polyquest, Inc. v. Vestar Corp, LLC*, No. 7:13-CV-23-F, 2014 WL 496494, at *11-12 (E.D.N.C. Feb. 6, 2014) (dismissing UDTPA claim regarding internal operations of a joint venture, because the joint venture was a "single market participant," even if technically comprised of separate entities).

Kasparov devotes merely one sentence in attempt to articulate how Zacherl's actions supposedly affect commerce: "Zacherl's actions affected commerce by preventing Kasparov's access to its property, which is used, *inter alia*, in its regular course of business as part of the Rook Project." *Id.* ¶ 124. However, the Complaint does not explain how *Kasparov's* access to the Wallets and assets it alleges it owns affects commerce. Kasparov does not allege that its diminished access to or control over the Wallets affected any person or entity apart from Kasparov itself. The lone sentence Kasparov includes in attempt to satisfy this critical element of the UDTPA is vague and conclusory, and thus vastly insufficient. *See Maxwell*, 2007 WL 2156337, at *7. Because Kasparov has not adequately alleged that Zacherl's conduct affected commerce, it fails to state a claim under the UDTPA.

Kasparov's UDTPA claim should also be dismissed because it fails to allege any impact on North Carolina commerce or consumers. The court's decision in *Verona v. U.S. Bancorp*, No. 7:09–CV–057–BR, 2011 WL 1252935 (E.D.N.C. Mar. 29, 2011) is instructive with respect to the extraterritorial application of the statute. The court began by noting that a prior court held that the statute "requires an in-state injury to plaintiff before plaintiff can state a valid unfair trade claim." *Verona*, 2011 WL 1252935, at *12 (quoting *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494 (M.D.N.C.1987)). Noting that successful plaintiffs could receive treble damages and attorneys' fees under the UDTPA, the court in '*In' Porters* found it appropriate to limit the statute's "reach to cases involving a substantial effect on plaintiff's operations in North Carolina." *Id.* (citing *The 'In' Porters, S.A.*, 663 F.Supp. at 502). The ultimate conclusion of *'In' Porters* was that "[b]ecause the plaintiff admitted that its business operations were solely in France and that it had no operations in North Carolina, the court concluded the claim falls outside the reach of 75–1.1[.]" *Id.* (internal quotations omitted). The court then highlighted the line of cases

following *'In' Porters* "to dismiss UDTPA claims by foreign entities" where the plaintiff failed to allege an effect on North Carolina commerce. *Id.* at *13. While the court in *Verona* recognized the possibility that a claim could be asserted under the UDTPA by a foreign plaintiff against a North Carolina business, it only found that to be true where the unfair and deceptive acts "took place in and emanated from" the business's headquarters in North Carolina. *Id.* at *15. Thus, a foreign plaintiff must allege some nexus to North Carolina commerce, and the mere fact that one or more defendants resides in North Carolina is not sufficient on its own.[9]

The only injury Kasparov has alleged is to itself, and it has alleged that it is incorporated and has its principal place of business in Singapore. Amend. Compl. ¶ 21. The claims against Zacherl relate to his activities in connection with the Rook Project, which is administered by Kasparov. Apart from the allegations that Zacherl performs services related to the Rook Project, and that he resides in North Carolina, there are no allegations of any other nexus between Kasparov's claims and North Carolina. In fact, Kasparov does not allege that any of the actions Zacherl took that form the basis for its claims took place in North Carolina. At most, Kasparov has alleged that Zacherl altered the signatories for the Wallets, which Kasparov alleges it established and has at all times owned, and does not allege are located in North Carolina.

---

[9] *See The 'In' Porters*, 663 F.Supp. at 501-02 (dismissing UDTPA claim because it involved "a foreign plaintiff suing a resident defendant over alleged foreign injuries having a negligible effect, if any, on North Carolina trade or commerce."); *Merck & Co. Inc.*, 941 F. Supp. 1443 (dismissing UDTPA claim by foreign plaintiffs against North Carolina defendant because plaintiffs did not experience substantial effects on any North Carolina business operations); *US LEC Commc'ns, Inc. v. Qwest Commc'ns Corp.*, No. 3:05-CV-00011, 2006 WL 1367383, at *3 (W.D.N.C. May 15, 2006) (rejecting UDTPA counterclaim by foreign defendant against North Carolina-based plaintiff because defendant "failed to allege that it suffered substantial in-state injury" to business operations in North Carolina); *Dixie Yarns, Inc.*, 1994 WL 910955 (dismissing UDTPA counterclaim by foreign defendant against plaintiff whose relevant conduct occurred at its North Carolina manufacturing plant because defendant did not experience business injury in North Carolina).

Moreover, Kasparov alleges that several of the changes to the signatories giving rise to its claims were taken by "Zacherl, Linehan and Detz" or "Zacherl and Linehan." *See Id*. ¶¶ 16-18. Kasparov alleges Linehan and Detz reside in New Hampshire and Massachusetts. *Id*. ¶¶ 24-25. There are no allegations of any injury felt in North Carolina, or any effect whatsoever on North Carolina commerce. Thus, the extraterritorial application of the UDTPA would be entirely inappropriate and inconsistent with precedent.

Kasparov's UDTPA claim should also be dismissed for failure to adequately allege an unfair or deceptive trade practice. The UDTPA cause of action does not specifically identify what unfair or deceptive practices form the basis for this claim, but refers generally to the allegations that Zacherl made misrepresentations that "fraudulently induce[d] Kasparov's consent to access Kasparov's Wallets." *Id.* ¶ 123. As discussed further in relation to the contract and fraud claims, there is no allegation in the Amended Complaint of a specific communication wherein Zacherl promised to act as Kasparov's agent in his capacity as a signatory. *See Packrite, LLC v. Graphic Packaging Int'l, LLC*, No. 1:17CV1019, 2020 WL 7060395, at *7 (M.D.N.C. Dec. 2, 2020) (fraud and UDTPA claims should not be treated with "two different pleading standards" and "[f]or the same reason that these allegations were not pled with sufficient specificity to satisfy its fraudulent omission claim, they likewise do not support this claim for unfair and deceptive trade practices") (internal quotations omitted). In any event, a private communication between Zacherl and Kasparov – not alleged to involve or impact the public or North Carolina consumers whatsoever – cannot support a UDTPA claim.

## F.   KASPAROV'S CIVIL CONSPIRACY CLAIM FAILS.

"It is well established that there is not a separate civil action for civil conspiracy in North Carolina . . . . Instead, civil conspiracy is premised on the underlying act." *Gottfried v. Covington*,

No. 13 CVS 456, 2014 WL 2921922, at *6 (N.C. Super. June 25, 2014). "North Carolina courts have held that a civil conspiracy claim is subject to dismissal when the underlying causes of action, which contain the alleged wrongful acts, are dismissed." *Koch Measurement Devices, Inc. v. Armke*, No. 12 CVS 3478, 2015 WL 2092649, at *10 (N.C. Super. May 1, 2015) (internal quotations omitted). Because Kasparov fails to state any other claim, the civil conspiracy claim must be dismissed. *See Gottfried*, 2014 WL 2921922, at *7 (finding "Plaintiff's underlying claim for conversion" based on intangible interests "fails, leaving no premise for the civil conspiracy claim"). *See also Koch Measurement Devices, Inc.*, 2015 WL 2092649, at *10 ("Plaintiff's claim for civil conspiracy is based entirely on Armke's alleged breach of fiduciary duty," which was dismissed, and thus "[t]he Court concludes that North Carolina law mandates dismissal of Plaintiff's claim for civil conspiracy").

## G.      THERE IS NO BASIS FOR DECLARATORY RELIEF.

Finally, Kasparov tacks on a request for declaratory relief that is entirely duplicative of its other causes of action and should be dismissed. Declaratory judgments under federal law[10] are "purely remedial and do[] not create jurisdiction or create substantive rights." *Sasso*, 584 F.Supp.3d. at 71. This means that a "request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred." *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 55-56 (4th Cir. 2011). Courts have thus rejected declaratory judgment claims where the plaintiff's other substantive claims have failed. *See e.g.,*

---

[10] "[F]ederal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction." *See Sasso v. Tesla, Inc.*, 584 F.Supp.3d 60, 70 (E.D.N.C. 2022); *see also Staffing Advantage LLC v. Definitive Staffing Sols., Inc.*, No. 7:20-CV-00150-M, 2021 WL 2426340, at *9 (E.D.N.C. June 14, 2021) ("[I]n adjudicating claims for declaratory relief, federal courts apply the federal Declaratory Judgment Act, 28 U.S.C. § 2201, rather than state analogues like N.C. Gen. Stat. § 1-253.).

*id.* ("Here, CGM's substantive claims fail. Accordingly, so must its Declaratory Judgments Act claim."); *Robinson v. E. Carolina Univ.*, 329 F.Supp.3d 156, 186 (E.D.N.C. 2018) ("Because plaintiff has no underlying federal legal claim . . . the court lacks jurisdiction over plaintiff's declaratory judgment claim."). Likewise, courts have exercised their discretion to dismiss requests for declaratory judgment that are duplicative of the plaintiff's other claims. *See Willis v. Cleveland Cnty., N. Carolina*, No. 1:18-cv-00292-MR-WCM, 2020 WL 3578297, at *18 (W.D.N.C. July 1, 2020) ("A district court, in its discretion, may decline to entertain a declaratory judgment claim for good reason" and "Courts have used that discretion to decline to adjudicate declaratory judgment actions that are duplicative of other claims in the same case" and based on the same allegations).

If Kasparov's other causes of action are dismissed, which they should be for the reasons set forth above, then its declaratory judgment claim must be dismissed as well. Moreover, Kasparov's declaratory judgment claim is based on the *exact same* allegations that underpin its other claims. Specifically, Kasparov seeks "a declaration that (1) it has the right to immediately possess the Team Tokens Wallet, the Second Company Wallet and all of the assets contained therein, and (2) that Zacherl has no right to possess the Team Tokens Wallet or the Second Company Wallet or any of the digital assets therein." Amend. Compl. ¶ 128. Thus, Kasparov's request for declaratory relief requires the adjudication of the same legal question at the core of its other causes of action: whether the alleged changes to the Wallet signatories described in Section C, *supra*, were unlawful. Therefore, the court should exercise its discretion and dismiss

Kasparov's request for declaratory judgment for the additional reason that it is duplicative of the other causes of action.[11]

## H. PLAINTIFF SHOULD BE DENIED LEAVE TO AMEND.

Kasparov should not be given another opportunity to amend its deficient Complaint, and any motion for leave to amend should be denied. Although Kasparov was entitled to amend its Complaint once as a matter of course pursuant to Fed. R. Civ. P. 15, all of the "new" allegations and claims Kasparov asserted in its Amended Complaint – including the allegations that it formed an agreement with Zacherl and that Zacherl engaged in fraud based solely on an April 20, 2022 message – could have been asserted from the outset of this case. Where "the factual allegations in . . . [the] amended complaint do not appear to be based on anything not known to plaintiff at the time [plaintiff] initiated this action," courts have denied motions for leave to amend in the absence of any explanation for the delay in asserting those allegations. *Purcell v. Morse*, No. 5:05-CV-460-BR, 2006 WL 8438673, at *2 (E.D.N.C. June 19, 2006).

<u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion and enter an order dismissing the Complaint and granting him such other and further relief as the Court deems just and proper.

---

[11]  Kasparov acknowledges its claim for declaratory relief is duplicative of its breach of contract claim in pleading it in the alternative. *Sprint Commc'ns Co., L.P. v. FairPoint Commc'ns, Inc.*, No. 3:16-CV-00820-GCM, 2017 WL 2919015, at *6 (W.D.N.C. July 7, 2017) (dismissing declaratory judgment claim where purpose of such claim "is only to resolve an already-existing breach of contract claim").

This the 3rd day of March, 2023.

*/s/ B. Chad Ewing*
WOMBLE BOND DICKINSON (US) LLP
B. Chad Ewing (N.C. State Bar No. 27811) 301
South College Street, Suite 3500 Charlotte, North
Carolina 28202-6037 Telephone: (704) 331-4996
Facsimile: (704) 338-7854
E-Mail: chad.ewing@wbd-us.com

HOGAN LOVELLS US LLP
Michael C. Hefter (*pro hac vice* application forthcoming)
Alan M. Mendelsohn (*pro hac vice* application forthcoming)
390 Madison Avenue
New York, New York 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
E-Mail: michael.hefter@hoganlovells.com
        alan.mendelsohn@hoganlovells.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2023, the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** was served via first class mail as follows:

Joseph A. Mahoney
N.C. State Bar No. 55318
Cecilia G. Rambarat
N.C. State Bar No. 58047
MAYER BROWN LLP
300 North Tryon Street, Suite 1800
Charlotte, NC 28202
(704) 444-3654
jamahoney@mayerbrown.com
crambarat@mayerbrown.com

Alex J. Lakatos
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006

Matthew H. Marmolejo
MAYER BROWN LLP
333 South Grand Avenue, Suite 4700
Los Angeles, CA 90071

*Counsel for Plaintiff*

*/s/ B. Chad Ewing*
B. Chad Ewing