# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### No. 5:22-CV-503-D

| | |
|---|---|
| KASPAROV, PTE LTD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOSEPH ZACHERL, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

On December 9, 2022, Kasparov, PTE LTD, ("Kasparov" or "plaintiff") filed a complaint against Joseph Zacherl ("Zacherl" or "defendant") alleging conversion, unjust enrichment, civil conspiracy, and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). See [D.E. 1]. On January 20, 2023, Zacherl moved to dismiss for failure to state a claim [D.E. 10] and filed a memorandum in support [D.E. 11]. See Fed. R. Civ. P. 12(b)(6). On February 10, 2023, Kasparov filed an amended complaint [D.E. 12] adding allegations of fraud, constructive fraud, breach of contract, and breach of the implied covenant of good faith and fair dealing.[1]

On March 3, 2023, Zacherl moved to dismiss the amended complaint for failure to state a claim [D.E. 17] and filed a memorandum in support [D.E. 18]. See Fed. R. Civ. P. 12(b)(6). On April 7, 2023, Kasparov responded in opposition [D.E. 20]. On April 21, 2023, Zacherl replied [D.E. 23]. As explained below, the court grants in part and denies in part Zacherl's motion to dismiss the amended complaint.

---

[1] In light of Kasparov's amended complaint, the court dismisses as moot Zacherl's first motion to dismiss.

I.

The allegations in Kasparov's amended complaint center around Zacherl's work on the "Rook Project." Kasparov conceived the Rook Project, originally called the "KeeperDAO Project," to enable "members of the public to route trading orders via the [Rook Project's] infrastructure, and take part in the trading profits generated from marker makers . . . that fill these orders." Am. Compl. [D.E. 12] ¶¶ 5–6. Market makers would use the liquidity provided by members of the public for "flash loans" to help fund the Rook Project. See id. at ¶ 31. In exchange for members of the public "investing" their personal cryptocurrency in the Rook Project, Kasparov issued ROOK tokens ("ROOK") which Kasparov distributed to members of the public in proportion to the size of each individual's investment. See id. at ¶ 6. ROOK entitled holders to a share of the profits generated by the Rook Project and conferred voting privileges. See id. Kasparov generated a pool of 1,000,000 ROOK as "Team Tokens" used to compensate Kasparov (as founders of the project) and to "compensate persons for services necessary to the success of the Rook Project." Id. Team Tokens were held separately from the ROOK used to compensate investors in the Rook Project. See id.

Kasparov also created a Decentralized Automated Organization ("DAO") with the intent to eventually move control of the Rook Project to the DAO. See id. Kasparov would still keep Rook Project assets in the DAO's "treasury wallet," but the DAO would "call[] the shots with regard to the managements of the assets in the DAO Treasury Wallet." Id.

At some point in "late 2019," Kasparov "decided to collaborate with Defendants Zacherl, Linehan, and Detz, who would work on various aspects of the Rook Project, including software development and marketing." Id. at ¶ 7.[2] Around April 29, 2020, Kasparov and Zacherl, through

_____

[2] Although the amended complaint occasionally refers to Linehan and Detz as "defendants," Kasparov has not issued summons to these individuals, and they are not listed as defendants in the case heading.

2

Zacherl's company, "VolleyFire, LLC," entered into a services agreement pursuant to which Zacherl would receive four percent of the Team Tokens (ROOK) in exchange for Zacherl proving "services to the Project such as leading internal trading efforts at the DAO." Id. at ¶ 8.

Several months later, Kasparov created multiple "digital wallets" related to the Rook Project. On October 31, 2020, Kasparov created a "Team Tokens Wallet" which Kasparov designed to hold the 1,000,000 Team Tokens (ROOK). See id. at ¶ 10. The Team Tokens (ROOK) held by Kasparov and Zacherl were placed into this Team Tokens Wallet. See id. Around June 15, 2021, Kasparov created a "Second Company Wallet" and funded it with $700,000 worth of "USD Coin." See id.[3] Kasparov designed the Second Company Wallet as a method to pay for salaries, legal expenses, and smart contract audits. See id. Both wallets required several individual approvals ("signatures") from authorized individuals ("signatories") "before any transaction to or from the Wallets could be consummated." Id. at ¶ 11. When Kasparov created the wallets, the only two authorized signatories were Kasparov founders Taiyang Zhang and Tiantian Kullander. See id.[4] Kasparov claims to own all the digital assets in both wallets excluding the 40,000 ROOK paid to Zacherl pursuant to the Services Agreement. See id. at ¶ 35. In order to conduct any transaction with the Team Tokens Wallet, or to access the assets within, approval of at least three signatories is required. See id. at ¶ 56. The Second Company Wallet originally only required approval from two signatories. See id. at ¶ 62.

Kasparov alleges that between "October 2021 and February 2022, Kasparov added Zacherl and Linehan as signatories to the Second Company Wallet (containing over $700,000 in USD Coin),

---

[3] USD Coin is a stablecoin pegged to the United States dollar. See id.

[4] Around this time, Kasparov also created a "First Company Wallet" (to help fund "day-to-day administration of the project") and "DAO Treasury Wallet" (to hold profits from the Rook Project). Id. at ¶ 33.

3

under the agreement that as agents of Kasparov, Zacherl and Linehan would be subject to Kasparov's control." Id. at ¶ 41. By February 24, 2022, the Second Company Wallet had six signatories: Kullander, Taiyang Zhang, Bainy Zhang, Susruth Nadimpalli, Zacherl, and Linehan. See id. at ¶ 44. By January 6, 2022, the Team Tokens Wallet had seven signatories: Taiyang Zhang, Kullander, Bainy Zhang, Benjamin Wang, Susruth Nadimpalli, Zacherl, and Linehan. See id. at ¶ 50.

On April 20, 2022, Zacherl allegedly sent a message to Kullander and Zhang saying "[n]eed a few signatures today please. Payments from strategic reserve → to 4 keepers from pilot program integration bounties." Id. at ¶ 52 (alteration in original). Zacherl also noted that "[i]f [Kullander and Taiyang Zhang] can help knock out the first one we can polish off the rest." Id. Kullander and Taiyang Zhang replied, "[d]one." Id. Kasparov alleges that this communication constituted Zacherl offering to conduct several transactions on behalf of Kasparov if Kullander and Taiyang Zhang agreed to add Detz as a signatory to the Team Tokens Wallet. See id. Following this exchange, Zacherl added Detz as a signatory so that Zacherl, Detz, and Linehan would be able to "conduct transactions on behalf of Kasparaov, and subject to Kasparov's control." Id.

Kasparov alleges that beginning around June 7, 2022, Zacherl, Linehan, and Detz "conspired to create and execute a plan through which (1) Benjamin Wang, (2) Susruth Nadimpalli, and (3) Bainy Zhang, each of whom were representatives and/or associates of Kasparov, were removed as signatories on the Team Tokens Wallet." Id. at ¶ 53. To further the alleged conspiracy, Zacherl sought to have his agent, van Rheeden, added as a signatory to the Team Tokens Wallet. See id. at ¶ 54. Kasparov alleges that it did not consent to Wang, Nadimpalli, or Bainy Zhang being removed as signatories or approve van Rheeden being added as a signatory to the Team Tokens Wallet. See id. at ¶ 55. As a result of Zacherl removing Wang, Nadimpalli, and Bainy Zhang as signatories, and

4

following the death of Kullander,[5] Kasparov alleges that only Taiyang Zhang remains as a signatory under Kasparov's control. See id. at ¶ 56. As a result, Kasparov alleges that Zacherl has "misappropriated the Team Tokens Wallet, and the digital assets contained therein, from Kasparov, ensuring that, with their four signatories, they and their agents have a sufficient numerical bloc to control the Wallet, to the exclusion of Kasparov." Id.[6] Kasparov alleges that it no longer can access the assets in the Team Tokens Wallet. See id. at ¶ 60.

About July 5, 2022, Kullander "demanded the settlement of funds from the Team Tokens Wallet to a separate wallet to be held by Kasparov." Id. at ¶ 61. That day, Zacherl and Linehan allegedly seized control of the Second Company Wallet. See id. Zacherl did this by removing Bainy Zhang and Nadimpalli as signatories to the Second Company Wallet and adding Detz and van Rheeden as signatories. See id. Additionally, Zacherl allegedly "changed the signatory confirmation security protocol applicable to the Second Company Wallet to now require a minimum of three confirmatory approvals from registered signatories" so that Kasparov's two remaining signatories could not use the Wallet. Id. at ¶ 62. Kasparov did not consent to any of these changes to the Second Company Wallet. See id. at ¶ 65.

Kasparov alleges that Zacherl and others used their control of the Team Tokens Wallet to "loot" the DAO Treasury Wallet. The DAO Treasury Wallet is controlled by a majority vote and approval of a majority of ROOK holders. See id. at ¶ 67. Zacherl and Lineham allegedly voted for themselves to receive "base salaries" of $722,000 a year from the DAO Treasury Wallet. Id. Kasparov did not approve of these payments. See id. at ¶ 68. Kasparov was unable to vote against

---

[5] Zacherl allegedly removed Kullander as a signatory on November 28, 2022, five days after Kullander died. See id. at ¶ 58.

[6] Zacherl allegedly removed van Rheeden as a signatory and replaced him with an "unknown entity." Id. at ¶ 59.

5

this action because Zacherl "deprived Kasparov of its voting rights" by preventing Kasparov from accessing and voting with Kasparov's ROOK. Id.

## II.

Zacherl moves to dismiss for failure to state a claim. A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[ ] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court may also consider a document submitted by a moving party if it is "integral to the complaint and there

6

is no dispute about the document's authenticity." Goines, 822 F.3d at 166. Additionally, a court may take judicial notice of public records without converting the motion to dismiss into a motion for summary judgment. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

North Carolina law applies in this case. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). The court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation and citation omitted). In doing so, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/ Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue that it has not yet resolved, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted).

## A.

Kasparov alleges that Zacherl's alleged seizure of the Team Tokens Wallet and Second Company Wallet and unauthorized expulsion of Kasparov's signatories constitutes conversion of the digital assets held in the wallets. See Am. Compl. ¶¶ 69–79. Under North Carolina law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or

7

personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (internal citations omitted); see Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 505 F. Supp. 3d 570, 586 (M.D.N.C. 2020); Shinaberry v. Town of Murfreesboro, N.C., No. 2:17-CV-7, 2018 WL 1801417, at *6 (E.D.N.C. Apr. 16, 2018) (unpublished).

Kasparov must show both that it retained lawful ownership of the chattel and a right to immediate possession of the chattel. See Variety Wholesalers, Inc., 365 N.C. at 523, 723 S.E.2d at 747; Patterson v. Allen, 213 N.C. 632, 632, 197 S.E. 168, 168 (1938). "A successful claim of conversion requires that the plaintiff maintain a right of possession of the property superior to that of the alleged converter from the time of the disputed action though the time of suit." Interstate Narrow Fabrics, Inc. v. Century USA, Inc., 218 F.R.D. 455, 467 (M.D.N.C. 2003); see United States v. Currituck Grain, Inc., 6 F.3d 200, 205 (4th Cir. 1993). In North Carolina, "only goods and personal property are properly the subjects of a claim for conversion." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 414, 537 S.E. 248, 264 (2000). Conversion does not include real property or assumption of abstract "interests such as business opportunities and expectancy interests." Id., 537 S.E.2d at 264; see also Edmondson v. Am. Motorcycle Ass'n., Inc., 7 F. App'x 136, 148 (4th Cir. 2001) (per curiam) (unpublished).

Zacherl argues that "Kasparov's conversion claim fails because it is not based on an allegation that any of the digital assets (i.e., the ROOK tokens and other cryptocurrencies) contained in the Wallets were taken, diverted, diminished or misused." [D.E. 18] 13. Zacherl argues that the amended complaint only alleges "interference with [Kasparov's] rights with respect to, or degree of control over, the Wallets" which constitutes an "intangible interests that North Carolina courts have

**8**

recognized cannot support a conversion claim." Id.; see [D.E. 23] 4. Kasparov responds that Zacherl's conduct constitutes unauthorized dominion over Kasparov's personal property. See [D.E. 20] 5–6. Kasparov also argues that Zacherl did not have to drain the Wallets of the digital assets in order to support a conversion claim. See id.

Kasparov plausibly alleges conversion by alleging that Zacherl excluded Kasparov from exercising Kasparov's ownership rights over the ROOK and USD Coin assets in the Second Company Wallet and Team Token Wallet. Kasparov's allegation is similar to that of a landlord locking a tenant out of a property and denying the tenant access to the tenant's personal goods within the property. See Spinks v. Taylor, 303 N.C. 256, 265, 278 S.E.2d 501, 506 (1981), superseded by statute on other grounds as stated in Stanley v. Moore, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995). Like the plaintiff's conversion claim in Spinks, Kasparov's conversion claim is not premised solely on deprivation of the intangible right to access the location of the property (i.e., Kasparov's contractual right to access and amend the Wallets). Instead, Kasparov alleges that Zacherl essentially "locked" Kasparov out of its digital assets, resulting in the "exclusion of [Kasparov's] rights" over the digital assets. Variety Wholesalers, Inc., 365 N.C. at 723, S.E.2d at 747; see Intercollegiate Women's Lacrosse Coaches Ass'n, 505 F. Supp. 3d at 586.

The "intangible interests" involved in the cases Zacherl cites are distinguishable from Kasparov's interest in access to its ROOK and USD Coin. In Surratt v. Brown, No. 15 CVS 1551, 2015 WL 4523291, at *6 (N.C. Super. July 27, 2015) (unpublished), the court held that plaintiff's "right to partnership property, his membership interest in the LLC/Partnership, and his right to participate in management of the LLC/Partnership" constituted "intangible interests, such as business opportunities or expectancy interests [that] are not subject to conversion." In Kamel v. 5Church, Inc., No. 3:17-CV-507, 2019 WL 4024252, at *17 (W.D.N.C. Aug. 23, 2019) (unpublished), the

9

court held that administrative rights over email accounts are intangible assets which cannot be the subject of a conversion claim. As discussed, however, Kasparov is not alleging that Kasparov's control of the Wallets are the "property" that Zacherl converted. Instead, Kasparov identifies specific goods (the ROOK and USD coin) to which Zacherl has allegedly deprived Kasparov access. Although the "intangible asset" of access to the Wallets is implicated in Kasparov's conversion claim, Kasparov alleges that Zacherl converted the ROOK and USD Coin.

In opposition, Zacherl argues that Kasparov is simply alleging a "hypothetical" and that "Kasparov does not allege that Zacherl actually used his alleged voting bloc to deprive Kasparov of anything or to transfer Kasparov's assets out of the Wallets for his or any other person's benefit." [D.E. 23] 5. North Carolina law, however, does not require Kasparov to allege that Zacherl used the digital assets, simply that Zacherl's actions constituted a "denial or violation of the plaintiff's dominion over or rights in the property." Springs v. Mayer Brown, LLP, No. 3:09-CV-352, 2012 WL 366283, at *9 (W.D.N.C. Jan. 27, 2012) (unpublished); see Volt Power, LLC v. Butts, No. 7:19-CV-149, 2021 WL 3781881, at *3 (E.D.N.C. Aug. 24, 2021) (unpublished). Kasparov's failure to allege that Zacherl did not drain the Wallets of the digital assets does not defeat Kasparov's conversion claim.

As for Zacherl's argument that Kasparov failed to "allege that it made a demand for the return of its cryptocurrency or tokens," the amended complaint defeats the argument. Kasparov alleges that it "demanded the settlement of funds from the Team Tokens Wallet to a separate wallet to be held by Kasparov" but that Zacherl allegedly did not comply. See Am. Compl. ¶¶ 61, 77 ("Kasparov has demanded that Zacherl and his co-conspirators restore Kasparov's control and ability to utilize to the Team Tokens Wallet and the Second Company Wallet by restoring the removed Kasparov-affiliated representatives as signatories to both the Team Tokens Wallet and the Second

10

Company Wallet. Zacherl and his co-conspirators have refused to do so.").[7]  That Kasparov demanded access to the Wallets is not a "key distinction" that illustrates that Kasparov only seeks the intangible ability to access and control the Wallets.  Id. at ¶ 61 (emphasis added); see [D.E. 23] 4–5. Kasparov demanded access in order to regain control over its assets, presumably also to move the assets to new digital wallets, and not for the sake of regaining control of the Wallets alone.[8] Therefore, Kasparov has alleged an active, not merely hypothetical, interference with Kasparov's access to its digital assets.[9]

Alternatively, Zacherl argues that the ROOK and USD Coins themselves constitute intangible property. See [D.E. 18] 13.  In support, Zacherl cites cases allegedly holding that crypto currencies are "intangible goods." Id.; see Ox Labs, Inc. v. BitPay, Inc., 848 F. App'x 795, 796 (9th Cir. 2021) (unpublished); Currier v. PDL Recovery Grp., LLC, No. 14-12179, 2018 WL 4057394, at *2 (E.D. Mich. Aug. 27, 2018) (unpublished); Alexander v. BF Labs, Inc., No. 14-2159, 2014 WL 5406890, at *1 (D. Kan. Oct. 22, 2014) (unpublished).  Kasparov responds that Zacherl misunderstands these

---

[7] Indeed, that Kasparov had to demand Zacherl and his alleged agents to approve a transfer of the digital assets to another wallet helps illustrate that Zacherl deprived Kasparov of its control over the digital assets.  If Kasparov still had dominion over the digital assets, Kasparov could presumably freely access and transfer the tokens without Zacherl's permission.

[8] By analogy to Spinks, it would equate to the tenant asking for access to the residence in order to get her property back.  Access to the residence would be a prerequisite, even if temporary, to recover her property.

[9] Beyond the demand, the amended complaint also alleges that Zacherl's unauthorized adjustments to the Team Token Wallet signatories prevented Kasparov from accessing its ROOK and thus blocked Kasparov from being able to exercise its right to vote against the alleged salary increases for Zacherl and Linehan.  See Am. Compl. ¶ 20.  Although Zacherl may not have affirmatively used his alleged voting block to "veto" Kasparov from using ROOK to vote, Zacherl's alleged unauthorized changes to the wallet's signatories effectively deprived Kasparov the right to use ROOK to vote on distributions from the DAO Treasury Wallet.  Such allegations are beyond "hypothetical" and plausibly constitute actual interference with Kasparov's use of ROOK in the Team Tokens Wallet.

cases and that Kasparov's digital assets are analogous to money, profits, funds, and other assets that are recognized as proper subjects of a conversion claim under North Carolina law. See [D.E. 20] 8.

The cases Zacherl cites do not foreclose cryptocurrencies as a proper basis for a conversion claim. In Ox Labs, Inc., the Ninth Circuit applied California law and held that a party cannot "specifically recover its Bitcoins" from a party found liable for conversion, but can only recover monetary damages. Ox Labs, Inc., 848 F. App'x at 796. In Currier, the court held that a plaintiff in Michigan could not force a defendant to liquidate cryptocurrency accounts located in New York and directed plaintiff to "pursue his collection remedies" in a "New York federal court." Currier, 2018 WL 4057394, at *2. Finally, in Alexander, the court simply describes Bitcoin as an "intangible asset" in dicta. Alexander v. BF Labs, Inc., 2014 WL 5406890, at *1. Alexander did not involve conversion of Bitcoin assets, but only pre-paid equipment that plaintiffs intended to use to generate Bitcoin. Id. In contrast, Kasparov cites cases recognizing cryptocurrency as the proper subject for a conversion claim. See Hodges v. Harrison, 372 F. Supp. 3d 1342, 1351–52 (S.D. Fla. 2019); see Hodges v. Monkey Capital, LLC, No. 17-81370, 2018 WL 9686569, at *8–9 (S.D. Fla. Aug. 14, 2018) (unpublished); Jacobo v. Doe, No. 1:22-CV-672, 2022 WL 2052637, at *4–5 (E.D. Cal. Jun. 7, 2022) (unpublished); Lagemann v. Spence, No. 18 Civ. 12218, 2020 WL 5754800, at *10 & n.11 (S.D.N.Y. May 18, 2020) (unpublished).

This court predicts that the Supreme Court of North Carolina would recognize cryptocurrencies as a proper basis for a conversion claim. North Carolina law already recognizes that money, profits, and other assets can be the basis of a conversion claim so long as the assets are specific and identifiable. See Variety Wholesalers, 365 N.C. at 528, 732 S.E.2d at 750; Surrat, 2015 WL 4523291, at *7. Therefore, a digital asset is a proper basis for a conversion claim if (as alleged

here) the digital asset resembles that of money, profits, or another asset already recognized under North Carolina law.

USD Coin is analogous to money both conceptually and in how Kasparov allegedly used the coin. USD Coin, the digital asset in the Secondary Company Wallet, is a stable cryptocurrency with an identifiable value pegged to the value of the United States dollar which is easily analogized to money. See Am. Compl. ¶ 10. Kasparov used USD Coin as a method to pay for contractors, legal services, and other expenses. See id. Thus, USD Coin can serve as a basis of a conversion claim.

As for ROOK, ROOK arguably functions less like a fungible currency and more like traditional stock in a company. ROOK is not pegged to any currency. Kasparov distributed ROOK to public investors "in proportion to the size of each [investor's] stake." Id. at ¶ 6. Kasparov also kept 1,000,000 ROOK for itself, describing these "Team Token" ROOK as "very similar to founders' shares" in a start-up company. Id. In addition to providing the right to share in the profit of the Rook Project, ROOK also conferred voting rights on matters related to the Rook Project and distributions from the DAO Treasury Wallet. See id. at ¶ 67. These characteristics of ROOK make the token more akin to "stock" in the Rook Project, rather than money or a fungible currency. Nonetheless, courts applying North Carolina law routinely recognize that stock or other equity instruments can serve as the basis of a conversion claim. See, e.g., Whitacre P'ship v. Biosignia, Inc., 358 N.C. 1, 11, 591 S.E.2d 870, 878 (2004); Loyd v. Griffin, No. 20 CVS 2394, 2022 WL 2286086, at *9 (N.C. Super. June 23, 2022) (unpublished). Thus, ROOK can serve as the basis of the conversion claim.

In opposition, Zacherl argues that in order to allege conversion of money (or assets analogous to money), the claim must contain "allegations or evidence of a transfer of a specific amount of money from a plaintiff to a defendant, with the defendant taking possession of that specific,

13

identifiable amount." Taylor v. Bettis, 976 F. Supp. 2d 721, 744 (E.D.N.C. 2013). In Taylor, the court did not hold that a conversion claim involving money required a transfer as an element of the claim. See id. Rather, the court simply noted that, in the context of commingling of funds, the plaintiff had to produce "evidence of the specific source, specific amount, and specific destination of the funds in question." Id. at 743. Because this case does not involve commingling of funds and because Kasparov can identify the digital assets it alleged Zacherl converted, Taylor does not help Zacherl. Accordingly, the court denies Zacherl's motion to dismiss Kasparov's conversion claim.

## B.

Kasparov also alleges that Zacherl breached a contract with Kasparov when Zacherl added and removed signatories from the Wallets without Kasparov's consent. See Am. Compl. ¶¶ 80–88. Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); see Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276, 827 S.E.2d 458, 472 (2019) (per curiam); Cantrell v. Woodhill Enters., Inc., 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968); Montessori Children's House of Durham v. Blizzard, 244 N.C. App. 633, 636, 781 S.E.2d 511, 514 (2016); McLamb v. T.P., Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005) (citation omitted), disc. review denied, 360 N.C. 290, 627 S.E.2d 621 (2006).

Zacherl argues that Kasparov has failed to plausibly allege any contractual relationship. See [D.E. 11] 15; [D.E. 23] 6. In the amended complaint, Kasparov alleges that the parties formed a contract regarding "use of the Teams Token Wallet" around October 2021, in which Kasparov granted Zacherl and Linehan signatory authority on the Team Token Wallet so long as they used this authority "subject to Kasparov's control and prior authorization." Am. Compl. ¶ 81. Kasparov appears to consider this alleged contract to cover both the Team Token Wallet and the Second

14

Company Wallet. Kasparov alleges that the first instance of breach of this contract occurred on June 7, 2022, when Zacherl allegedly removed Wang, Nadimpalli, and Bainy Zhang from the Team Tokens Wallet without Kasparov's authorization. See id. at ¶ 85. Kasparov appears to consider every instance of Zacherl adding or removing a signatory on any of the Wallets without Kasparov's approval as a breach of the October 2021 contract. Kasparov does not allege that the parties ever reduced the terms of the alleged contract to writing.

Zacherl responds that Kasparov fails to plausibly allege a contract, including a "meeting of the minds as to the essential terms" of the contract. See [D.E. 18] 16; Al-Jamal v. Michael Baker Corp., No. 5:12-CV-746, 2013 WL 3356573, at *4 (E.D.N.C. July 3, 2013) (unpublished); Guiliani v. Duke Univ., No. 1:08-CV-502, 2010 WL 1292321, at *6 (M.D.N.C. Mar. 30, 2010) (unpublished). According to Zacherl, the lack of critical details in Kasparov's allegations reflect the foundational problem with Kasparov's breach of contract claim.

In the amended complaint, Kasparov alleges that on April 29, 2020, Zacherl (through his company, VolleyFire) and Kasparov executed a Services Agreement, whereby "Zacherl would lead certain trading elements in the Project, including the creation and operation of the Keepers that would consummate cryptocurrency arbitrage trades" in exchange for $10,000 dollars a month and a four percent cut of the ROOK located in the Team Tokens Wallet. Am. Compl. ¶¶ 36–37. Therefore, Zacherl already had a valid contract with Kasparov outlining Zacherl's responsibilities on the Rook Project before entering into the alleged oral contract or new course of dealing in October 2021.

In light of the Services Agreement, it is implausible that Zacherl knowingly entered into an additional contract with Kasparov in which he once again agreed to become Kasparov's agent on the Rook Project for an indefinite period of time without significant additional compensation. Notably,

the alleged new October 2021 contract encompasses actions that Zacherl already would be undertaking pursuant to the 2020 Services Agreement. Kasparov alleges that in October 2021, Zacherl agreed to become Kasparov's "agent" and to work "for the benefit of the Rook Project" in exchange for signatory privileges on the Wallets. Id. at ¶ 81. Pursuant to the Services Agreement, however, Zacherl already worked for the benefit of the Rook Project and adding Zacherl as a signatory on the Wallets would fit directly into Zacherl's pre-existing obligations under the Services Agreement.[10] Because allowing Zacherl and others to access and manage the wallet is tied directly to Zacherl's work on the Rook Project under the Services Agreement, it is implausible that Zacherl agreed in October 2021 to an entirely new agency agreement beyond the one in the Services Agreement.

It is also implausible that Zacherl agreed that conditional access to the Wallets alone would be Zacherl's only consideration for the alleged October 2021 contract. Kasparov alleges that in "February 2022, Zacherl told Kasparov that he was unhappy with the allocation of the Team Tokens, more of which he believed should have been allocated to himself, Detz and Linehan. However, this was more compensation than they had bargained for and agreed to receive." Id. at ¶ 13. The amended complaint states that Zacherl received four percent of Team Tokens (ROOK) under the Services Agreement and does not allege that Zacherl received more ROOK pursuant to some alleged October 2021 oral contract. See id. at ¶¶ 36–37. Indeed, Kasparov argues that the Services Agreement, not the new alleged contract, established who owned the ROOK inside the Team Tokens Wallet. See [D.E. 20] 12. Thus, in the context of the facts alleged in the amended complaint, it is implausible that Zacherl knowingly entered into a new, valid oral contract (with additional access

---

[10] Adding Zacherl as a signatory to the Team Token Wallet also would allow Zacherl more control over the compensation received under the Services Agreement. The four percent cut of ROOK that Zacherl earned under the Services Agreement was stored in the Team Token Wallet.

16

being the only consideration) to become Kasparov's agent (again) in October 2021, or that he and Kasparov entered into some new course of conduct sufficient to establish an implied in fact contract.[11]

Kasparov argues that it has plausibly alleged "the who (i.e., the parties were Zacherl and Kasparov), the what (i.e., the terms afforded Zacherl access to Kasparov's Wallets as an agent of Kasparov), the when (i.e., the contracts were entered in October 2021), and the why (to allow Zacherl to better assist with the ROOK project) of the contracts." [D.E. 20] 14. However, the "when" and the "what" are vague and conclusory. Although Kasparov suggests that on an unidentified date in October 2021 Kasparov engaged in "discussions" outlining the scope of the alleged oral contract, the amended complaint contains no details about the content of these discussions, the date, or who was involved. See id. at 12 (citing Am. Compl. ¶ 47). Kasparov then claims to have alleged "the dates Kasparov and Zacherl entered into the contracts." Id. (citing Am. Compl. ¶¶ 82–84). The cited paragraphs, however, only note the dates that Kasparov added Zacherl as a signatory to the Team Token Wallet and Second Company Wallet. Moreover, Kasparov's reference to multiple "contracts" adds to the confusion. It is unclear if Kasparov considers Zacherl's access to the Team Token Wallet and Second Company Wallet to constitute separate contracts, if this is a reference to separate contracts with Lineham or Detz (even though Lineham and Detz are not the subject of the breach of contract claim), or if this is a reference to something else.

Kasparov's assertion that "[t]he contrary inference, that Zacherl was free to exclude Kasparov from the Wallets that contained its assets, makes no sense" does not save its claim. [D.E. 20] 14. "[W]here one party simply believes that a contract exists, but there is no meeting of the minds, the

---

[11] Although Linehan also allegedly entered into the 2021 contract with Kasparov to become a signatory, Linehan is not a defendant in his action and Kasparov has not alleged any facts that would lead Zacherl to be responsible for any alleged contract between Zacherl and Linehan.

individual seeking to enforce the obligation upon an express or implied-in-fact theory is without a remedy." Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol, 893 F. Supp. 526, 538 (E.D.N.C. 1994).

It is also unclear that Kasparov received any new consideration for the alleged October 2021 contract. Kasparov claims that "it entered into a contract with Zacherl to provide Zacherl with signatory authority in exchange for Zacherl's use of that authority as Kasparov's agent." [D.E. 20] 15. However, through the Service Agreement, Zacherl already acted as Kasparov's agent on the Rook Project. Thus, this alleged October 2021 contract appears to simply affirm Zacherl's pre-existing obligation.

Although both parties appear to agree that the Services Agreement is a valid contract, Kasparov does not plausibly allege that the parties sought to modify the contract in 2021 or that Zacherl breached the terms of the Services Agreement. Indeed, Kasparov's cause of action for breach of contract fails to mention the Services Agreement at all, instead alleging the existence of a new contract or course of conduct arising in October 2021. See Am. Compl. ¶¶ 80–88. Because it is implausible from the face of the amended complaint that Zacherl agreed to a new contract in October 2021 under the terms alleged in the amended complaint, Kasparov's breach of contract claim fails. Accordingly, the court dismisses Kasparov's breach of contract claim.

## C.

Kasparov also alleges, that Zacherl breached the implied covenant of good faith and fair dealing by "unlawfully and intentionally taking actions . . . that prevented Kasparov from receiving the benefits of the agreement between Kasparov and Zacherl . . . ." Id. at ¶ 95. Under North Carolina law, contracts implicitly contain "the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform

[its] obligations under the agreement." Maglione v. Aegis Fam. Health Ctrs., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) (quotation omitted); see Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228–29, 333 S.E.2d 299, 305 (1985). Where parties have executed a written contract, an action for "breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract." McKinney v. Nationstar Mortg., LLC, No. 5:15-CV-637, 2016 WL 3659898, at *8 (E.D.N.C. July 1, 2016) (unpublished) (quotation and alteration omitted); see Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996). Although breach of the implied covenant of good faith and fair dealing is a separate claim from breach of contract, Nadendla v. WakeMed, 24 F.4th 299, 307–08 (4th Cir. 2022), where there was no breach of contract, "it would be illogical . . . to conclude that [the party] somehow breached implied terms of the same contract." SunTrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012); see Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 368 N.C. 440, 451, 781 S.E.2d 1, 9 (2015); see also Sutherland v. Domer, No. 1:17-CV-769, 2018 WL 4398259, at *5 (M.D.N.C. Sept. 14, 2018) (unpublished) ("When a plaintiff's claim for breach of the implied covenant of good faith is based on an alleged breach of the express terms of the contract, these two claims are treated as a single breach of contract issue and evaluated together . . . . Where a plaintiff argues that the implied covenant was breached separate and apart from express breaches of the contract, it remains true that the implied covenant can never produce a result contrary to, or inconsistent with, the express language used in the agreement." (citation omitted)).

Because the court dismisses the breach of contract claim, the court also dismisses this claim. Moreover, although Kasparov appears to argue that it can allege this claim independent of a breach of contract, North Carolina law forecloses this argument. Accordingly, the court dismisses Kasparov's breach of the implied covenant of good faith and fair dealing claim.

19

**D.**

Alternatively, Kasparov alleges that Zacherl and his alleged co-conspirators unjustly enriched themselves by making the adjustments to the signatories of the wallets and by "looting" the DAO Treasury Wallet. See Am. Compl. ¶¶ 96–100. Under North Carolina law, "[w]hen one party confers a benefit upon another which is not required by a contract either express or implied or a legal duty, the recipient thereof is often unjustly enriched and will be required to make restitution therefor." Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co., 184 N.C. App. 688, 695, 647 S.E.2d 111, 116 (2007) (alteration and quotation omitted). In an unjust enrichment case, "the focus is . . . on the circumstances, if any, which would render it unjust for the owner to keep the benefit of the improvements without compensating the improver." Wright v. Wright, 305 N.C. 345, 353, 289 S.E.2d 347, 352 (1982). Specifically, the unjust-enrichment inquiry focuses on whether the circumstances of the case "give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." Norman, 140 N.C. App. at 417, 537 S.E.2d at 266. "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party," the benefit must be "measurable," and "the defendant must have consciously accepted the benefit." Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

Zacherl argues that the unjust enrichment claim fails for two reasons: (1) Kasparov fails to plausibly allege "that a benefit was conferred under circumstances which give rise to a legal or equitable obligation" and (2) Kasparov has failed to allege a measurable benefit to Zacherl. [D.E. 18] 19–20 (quotation omitted).

The court rejects Zacherl's first argument. In the amended complaint, Kasparov plausibly alleges that Kasparov gave Zacherl access and control over the Wallets to work on Kasparov and the

20

Rook Project's behalf, and Zacherl allegedly abused this trust by locking Kasparov out of the Wallets by making unauthorized changes to the signatories. See Am. Compl. ¶¶ 41–68.

As for whether Kasparov plausibly alleged a measurable benefit to Zacherl, Kasparov contends that the "measurable benefit" is the "the value of the digital assets held in the Wallets that Zacherl has co-opted, worth over US $8,100,000 at the time of the Amended Complaint." [D.E. 20] 19. Zacherl responds that he did not steal the assets and that "there is no allegation Zacherl took any assets from the Wallets for himself or any other person, and Kasparov acknowledges its ownership of the assets is not in dispute." [D.E. 23] 9.

Kasparov cites Intercollegiate Women's Lacrosse Coaches Association, and argues that Zacherl has received a benefit of $8,100,000. The case cannot bear the weight Kasparov places on it. In that case, plaintiff alleged that a venue owner relied on plaintiff's sponsorship as a "valuable drawing card for the registration of teams and players" and refused to issue refunds when the tournament was cancelled. See Intercollegiate Women's Lacrosse Coaches Ass'n, 505 F. Supp. 3d at 586–87. The court held that by keeping all of the registration funds and refusing to issue refunds, the venue owner unjustly enriched itself by keeping the money plaintiff's sponsorship helped bring in without giving plaintiff any benefit in return. See id.

Although Intercollegiate Women's Lacrosse Coaches Association does not support the arguments that Kasparov makes, it does suggest that Zacherl's use of his control over the Wallets to reap financial benefits can serve as a measurable benefit for an unjust enrichment claim. In the amended complaint, Kasparov plausibly alleges that Zacherl used his control over the Team Token Wallet to exclude Kasparov from voting with its ROOK to "stop [Zacherl's] looting of the DAO Treasury Wallet." Am. Compl. ¶ 20. The amended complaint alleges that Zacherl has drawn hundreds of thousands of dollars from the DAO Treasury Wallet to pay himself and his alleged co-

21

conspirators unearned payments. This alleged looting of the DAO Treasury Wallet, accomplished through Zacherl's control of the Team Tokens Wallet, plausibly constitutes a measurable benefit and an unjust enrichment claim. Although Zacherl argues that any amount of "salary" cannot be used for an unjust enrichment claim because "Kasparov alleges that it agreed to pay Zacherl for his services," the court rejects this argument. [D.E. 23] 9. Kasparov does not allege that Zacherl is unjustly enriched by collecting salary pursuant to the Services Agreement, but that Zacherl abused his control over the Wallets to give himself payouts from the DAO Treasury Wallet in excess of Zacherl's contractual salary under the Services Agreement. Accordingly, the court denies Zacherl's motion to dismiss the unjust enrichment claim.

E.

Kasparov also alleges fraud. See Am. Compl. ¶¶ 101–08. North Carolina law requires plaintiff to allege five elements to state a fraud claim: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party. See Forbis v. Neal, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007); Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992); Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F. Supp. 2d 471, 476 (E.D.N.C. 2013). Additionally, "any reliance on the allegedly false representations must be reasonable." Forbis, 361 N.C. at 527, 649 S.E.2d at 387; see Johnson v. Owens, 263 N.C. 754, 756, 140 S.E.2d 311, 313 (1965); Laschkewitsch v. Legal & Gen. Am., Inc., 247 F. Supp. 3d 710, 721 (E.D.N.C. 2017), aff'd, 725 F. App'x 252 (4th Cir. 2018) (per curiam) (unpublished).

Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff who alleges a claim for fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P.

9(b). Thus, under Rule 9(b), a party must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what they obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quotation omitted); see McCauley v. Home Loan Inv. Bank, F.S.B., 710 F.3d 551, 559–60 (4th Cir. 2013); United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 455–61 (4th Cir. 2013); Strum v. Exxon Co., U.S.A., 15 F.3d 327, 331 (4th Cir. 1994). "These facts are often referred to as the who, what, when, where, and how of the alleged fraud." Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc., 888 F.3d 696, 705 (4th Cir. 2018) (quotations omitted).

Kasparov bases its fraud claim on a message chain from April 20, 2022, in which Zacherl contacted Kullander and Zhang stating "'[n]eed a few signatures today please. Payments from strategic reserve ➔ to 4 keepers from pilot program integration bounties[,]' and that '[i]f you guys can help knock out the first one we can polish off the rest.' In response, one of the principals of Kasparov, Tiantian Kullander, replied '[d]one.'" Am. Compl. ¶ 102 (alteration in original). Kasparov alleges that based on this message that Kasparov added Detz as a signatory so that Zacherl, Detz, and Linehan could conduct transactions themselves. See id. Kasparov alleges, however, that this April 20, 2022 message was "reasonably calculated to deceive Kasparov" into giving Zacherl and his co-conspirators signatory privileges, which Zacherl then used to deprive Kasparov access to the Wallets on or about June 7, 2022. Id. at ¶¶ 104–08.

The April 20, 2022 messages do not suffice to sustain Kasparov's fraud claim. The April 20, 2022 messages simply convey Zacherl's intent to conduct three transactions with three vendors and requests that Kullander and Zhang conduct one transaction themselves. See id. at ¶ 102. Detz is not mentioned in the message, and Zacherl does not request in the message that Kasparov add anyone

23

as a signatory, let alone specifically request Detz. Even if Kasparov added Detz as a signatory on the same day as these messages, Kasparov fails to mention or allege the other conversations or communications in which Zacherl identifies Detz as Zacherl's preferred signatory, requests that Kasparov adds Detz as a signatory, or makes any promises about Detz's role as a signatory. Moreover, Kasparov does not plausibly allege that Zacherl failed to do what he said he would do in these messages: conduct three transactions with vendors. Even if Kasparov believed that these promises somehow were implicit in the short messages and relied on these messages to assume that Zacherl, Lineham, and Detz now were Kasparov's direct agents and would not engage in any transactions without Kasparov's approval, such reliance would be unreasonable because it is not supported by the content of the messages. Especially in light of any allegation that Zacherl failed to conduct the three transactions he mentions in the messages, Kasparov asks the court to read far too much into these three messages beyond a simple promise to conduct three transactions on Kasparov's behalf.

Kasparov notes that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [he] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784; see [D.E. 20] 3. The April 20, 2022 messages are not fraudulent on their face, and Kasparov has failed to allege with sufficient particularity any fraudulent material omissions. Kasparov also has failed to allege with particularity other materially fraudulent messages or representations. Accordingly, the court dismisses Kasparov's fraud claim.

F.

Kasparov also alleges constructive fraud. See Am. Compl. ¶¶ 109–14. To assert a constructive fraud claim, Kasparov must plausibly allege:

(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured. Intent to deceive is not an element of constructive fraud. The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself.

Clay v. Monroe, 189 N.C. App. 482, 488, 658 S.E.2d 532, 536–37 (2008); White v. Consolidated Planning, Inc., 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004). In cases of constructive fraud, Rule 9's "particularity requirement may be met by alleging facts and circumstances 1) which created the relation of trust and confidence, and 2) which led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." Terry v. Terry, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981). "Under North Carolina law, the key to a constructive fraud claim is a fiduciary relationship between plaintiff and defendant, [and] parties to a contract generally do not become each other's fiduciaries." Dreamstreet Invs., Inc. v. MidCountry Bank, 842 F.3d 825, 831 (4th Cir. 2016); Cash v. State Farm Mutual Automobile Ins. Co., 137 N.C. App. 192, 206, 528 S.E.2d 372, 381 (2000) (declining to find that an insurer has a fiduciary duty with respect to the settlement of claims). What parties to a contract "owe each other is defined by the terms of their contracts, with no special duty of loyalty." Dreamstreet Invs., Inc., 842 F.3d at 831. "It is not sufficient for plaintiff to allege merely that defendant had won his trust and confidence and occupied a position of dominant influence over him." Rhodes v. Jones, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950).

Kasparov argues that the amended complaint "alleges both a de jure and a de facto fiduciary duty" through an alleged principal-agent relationship between Kasparov and Zacherl and a de facto relationship stemming from Kasparov granting Zacherl discretion to manage assets in the Team Token Wallet and Second Company Wallet. [D.E. 20] 27–28 (emphasis omitted). Zacherl responds

that the amended complaint does not allege a principal-agent relationship and that Kasparov's de facto fiduciary relationship theory is limited to "clearly recognized fiduciary relationships, such as between real estate brokers and their clients." [D.E. 23] 13.

As discussed, the court rejects the proposition that Zacherl and Kasparov entered into a new contract or agreement in October 2021 that established an indefinite principal-agent relationship. Moreover, the messages Kasparov cites from April 20, 2022, at most, establish a limited principal-agent relationship for the purpose of making three transactions which Zacherl successfully implemented. These messages in themselves do not establish an indefinite principal-agent relationship between Zacherl and Kasparov regarding Zacherl's signatory status on the Wallets.

Even assuming the amended complaint alleges the Services Agreement created a principal-agent relationship, this relationship would not establish de jure fiduciary duties. A contractual relationship generally does not give rise to fiduciary duties. See Dreamstreet Invs., Inc., 842 F.3d at 831; Cash, 137 N.C. App. at 206, 528 S.E.2d at 381. Even if the court assumes that the Services Agreement is more akin to making Zacherl a temporary employee of Kasparov, North Carolina law generally does not impose fiduciary duties on employees. See Dalton v. Camp, 353 N.C. 647, 651–52, 548 S.E.2d 704, 707–08 (2001). Ultimately, given North Carolina law's strong hesitation to impose fiduciary duties on contracting parties or employees, Kasparov fails to plausibly allege that the Services Agreement imposed a fiduciary duty on Zacherl.

Kasparov also fails to plausibly allege facts that could give rise to a de facto fiduciary relationship. "The standard for finding a de facto fiduciary relationship is a demanding one[.]" Lockerman v. S. River Elec. Membership Corp., 250 N.C. App. 631, 794 S.E.2d 346, 352 (2016) (emphasis omitted). "Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special

circumstance of a fiduciary relationship has arisen." Id.; see S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008). North Carolina courts have generally found de facto duties in relationships such as

> (1) Trustee and cestui que trust dealing in reference to the trust fund; (2) Attorney and client, in respect to the matter wherein the relationship exists; (3) Guardian and ward, just after the ward arrives at age; and (4) A general agent and his principal where the agent has the entire management of the principal's affairs.

Stone v. McClam, 42 N.C. App. 393, 401, 257 S.E.2d 78, 83 (1979).

Beyond these traditional fiduciary relationships, Kasparov cites cases in which courts have found facts supporting the existence of a de facto fiduciary relationship. These cases are distinguishable. In Daley-Bishop, the court held that a plaintiff "alleged sufficient facts that she placed a special confidence in [defendant] to manage and protect her interests in the Property from afar" and that plaintiff "relied on [defendant's] experience and assurances that she could entrust the management of the Property to it." Daley-Bishop v. Long & Foster Prop. Mgmt., No. 5:19-CV-270, 2020 WL 6059843, at *7 (E.D.N.C. June 3, 2020) (unpublished), report and recommendation adopted, No. 5:19-CV-270, 2020 WL 4053595 (E.D.N.C. July 20, 2020) (unpublished). The plaintiff in Daley-Bishop was completely absentee, had little information about the state of her property, and entrusted defendant entirely with controlling her property and ensuring tenants complied with the terms of their lease. See id. In other words, plaintiff had little to no information about her property and defendants exercised complete control. See id.

The allegations in the amended complaint fail to plausibly allege that Kasparov entrusted Zacherl with a degree of domination or control sufficient to establish a de facto fiduciary relationship. The amended complaint alleges simply that Kasparov entrusted Zacherl, and his alleged co-conspirators, with signatory authority on the Wallets. See Am. Compl. ¶ 110. But simply

27

having signatory authority on a Wallet does not constitute dominion, control, or "holding all the cards." In fact, the amended complaint makes clear that Kasparov did not entrust Zacherl with domination over the Wallets and that Kasparov considers such domination to be unlawful. Indeed, Zacherl's domination over the Wallets is the foundation of Kasparov's amended complaint. See, e.g., id. at ¶¶ 69–86. Kasparov has also failed to allege any kind of information asymmetry that put Kasparov completely at Zacherl's mercy. The amended complaint mentions, among other things, that Kasparov had enough information to know that Zacherl and his co-conspirators allegedly had seized majority control of the Wallet and demand the assets back. See, e.g., id. at ¶ 17. Therefore, the amended complaint fails to plausibly allege facts that would give rise to a de facto fiduciary relationship.

In opposition, Kasparov notes that the Supreme Court of North Carolina has held that a question about the existence of a fiduciary relationship is usually "a question of fact for the jury." Carcano v. JBSS, LLC, 200 N.C. App. 162, 178, 684 S.E.2d 41, 53 (2009). However, courts have dismissed similar de facto fiduciary duty allegations where, like here, a plaintiff does not plausibly allege that the defendant held "all the cards" and exercised "domination and control" over plaintiff or their property. See, e.g., Johnson v. Fussell, No. 7:21-CV-196, 2023 WL 3258448, at *7 (E.D.N.C. Feb. 16, 2023) (unpublished). Accordingly, the court dismisses Kasparov's constructive fraud claim.

G.

Kasparov also alleges that Zacherl engaged in a conspiracy with Linehan, Detz, and van Rheeden to misappropriate Kasparov's digital assets in the wallets. See Am. Compl. ¶¶ 115–20. The elements of a civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff

28

inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." Strickland v. Hedrick, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quotation omitted); see State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444, 666 S.E.2d 107, 115 (2008); Privette v. Univ. of N.C. at Chapel Hill, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989). North Carolina law requires an overt act in furtherance of the conspiracy. See Dove v. Harvey, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005).

Zacherl argues only that the civil conspiracy claim should be dismissed because " Kasparov fails to state any other claim." [D.E. 18] 32. Zacherl makes no arguments in the alternative attacking the merits of the civil conspiracy claim. Accordingly, the court denies Zacherl's motion to dismiss the civil conspiracy claim.

## H.

Kasparov also alleges that Zacherl violated the UDTPA by "developing and executing a plan with his co-conspirators to fraudulently induce Kasparov's consent to access to Kasparov's Wallets." See Am. Compl. ¶ 123. The UDTPA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . ." N.C. Gen. Stat. § 75-1.1(a). To state an unfair and deceptive trade practices claim, a plaintiff must plausibly allege: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs. See SciGrip, Inc. v. Osae, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020); Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A practice is deceptive if it has the capacity or tendency to deceive." Walker, 362 N.C. at 72, 653 S.E.2d at 399 (cleaned up). "[I]t is not necessary for the plaintiff to show fraud, bad faith, deliberate

or knowing acts of deception, or actual deception, but plaintiff must show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." Gress v. Rowboat Co., 190 N.C. App. 773, 776, 661 S.E.2d 278, 281 (2008) (cleaned up); see Overstreet v. Brookland, Inc., 52 N.C. App. 444, 452–53, 279 S.E.2d 1, 7 (1981). However, a "mere breach of contract, even if intentional, is not an unfair or deceptive act." Waddell v. U.S. Bank Nat'l Ass'n, 395 F. Supp. 3d 676, 684 (E.D.N.C. 2019) (collecting cases); see Respess v. Crop Prod. Servs., Inc., No. 4:15-CV-176, 2016 WL 3821163, at *5 (E.D.N.C. July 13, 2016) (unpublished); Mitchell v. Linville, 148 N.C. App. 71, 75, 557 S.E.2d 620, 623–24 (2001).

To state a claim based on alleged misrepresentations, a plaintiff must plausibly allege "reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88–89, 747 S.E.2d 220, 226 (2013); see Johnson, 2022 WL 2447091, at *15. "Reliance, in turn, demands evidence showing that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." Bumpers, 367 N.C. at 89, 747 S.E.2d at 227 (cleaned up); Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F. Supp. 2d 471, 478 (E.D.N.C. 2013). To the extent Kasparov alleges that Zacherl "fraudulently induced Kasparov's consent to access" the Wallets, this claim sounds in fraud and Rule 9(b)'s heightened pleading requirements apply. See Am. Compl. ¶ 123; Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 731 (M.D.N.C. 2015) ("[T]his court need not decide whether Rule 9(b) governs all section 75–1.1 claims . . . [however,] Rule 9(b) applies to section 75–1.1 claims alleging detrimental reliance on false or deceptive representations.").

Kasparov's UDTPA claim fails for the same reason its fraud claim fails. Kasparov has failed to plausibly allege that Zacherl's April 20, 2022 messages constituted a fraudulent inducement.

30

Indeed, unlike in its fraud claim, Kasparov does not focus on the April 20, 2022 messages and instead focuses the allegation on an alleged "plan" between Zacherl and others to seize the Wallets through fraudulent misrepresentations. See Am. Compl. ¶ 123. As discussed, the only evidence of the alleged fraudulent misrepresentations, the April 20, 2022 messages, does not constitute "substantial prediscovery evidence" of the alleged fraud. Harrison, 176 F.3d at 784. Accordingly, the court dismisses Kasparov's UDTPA claim.

## I.

Zacherl moves to dismiss Kasparov's request of declaratory relief as duplicative of Kasparov's other causes of action. See [D.E. 18] 33; [D.E. 23] 14. Kasparov responds that this claim is not duplicative and that Kasparov seeks that "prospective clarity that Kasparov is the lawful owner of the digital assets in the Wallets, and will be entitled to immediate possession of the assets." [D.E. 20] 34.

A district court may decline to entertain a declaratory judgment claim for "good reason." Volvo Const. Equip. N. Am., Inc. v. LM Equip. Co., Inc., 386 F.3d 581, 594 (4th Cir. 2004). Courts have used that discretion to decline to adjudicate declaratory judgment actions that duplicate other claims in the same case. See, e.g., Laera v. Rosenbaum, No. 3:15-CV-371, 2016 WL 6775638, at *5 (W.D.N.C. Nov. 15, 2016) (unpublished). Although Kasparov pleads its request for declaratory judgment as an alternative to its breach of contract claim, this claim is unnecessary and duplicates the conversion and unjust enrichment claims. In determining the merits of these claims, the court will determine whether Kasparov actually owns the digital assets in the wallet (necessary for the conversion claim) and whether Zacherl unlawfully seized control of the Wallets to the exclusion of Kasparov (necessary for the unjust enrichment claim). Accordingly, the court dismisses Kasparov's request for declarative relief.

III.

In sum, the court DISMISSES AS MOOT defendant's first motion to dismiss [D.E. 10] and GRANTS IN PART defendant's motion to dismiss [D.E. 17]. The court DISMISSES plaintiff's breach of contract, good faith and fair dealing, fraud, constructive fraud, and UDTPA claims. The court also DISMISSES plaintiff's request for declaratory relief.

SO ORDERED. This _25_ day of July, 2023.

JAMES C. DEVER III
United States District Judge